844 F.2d 668
 46 Fair Empl.Prac.Cas. 1027,
46 Empl. Prac. Dec. P 37,935
CARIBBEAN MARINE SERVICES COMPANY, INC., a California
Corporation; Carlos A. Garcia, Plaintiffs-Appellees,
v.
Malcolm BALDRIGE, Secretary of Commerce of the United
States; Anthony Calio, Administrator, National Oceanic and
Atmospheric Administration; William Evans, Assistant
Administrator for Fisheries, National Marine Fisheries
Services; E.C. Fullerton, Southwest Regional Director,
National Marine Fisheries Service, Defendants-Appellants.
CAROLINE M. CORP., INC.; Jose R. Rebelo; Francisco M.
Nunes, Plaintiffs- Appellees,
v.
Malcolm BALDRIGE, Secretary of Commerce of the United
States; Anthony J. Calio, Administrator, National Oceanic
and Atmospheric Administration; William Evans, Assistant
Administrator for Fisheries Service; E.C. Fullerton,
Southwest Regional Director, National Marine Fisheries
Service, Defendants- Appellants.
 Nos. 87-57845, 87-5821.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 9, 1987.
Decided April 14, 1988.
 
 F. Henry Habicht, II, Asst. Atty. Gen., Washington, D.C., Peter K. Nunez, U.S. Atty., Karen M. Shichman, Asst. U.S. Atty., San Diego, Cal., Eileen Sobeck, Peter R. Steenland, Jr., and Alice Thurston, Dept. of Justice, Washington, D.C., for defendants-appellants.
 Charles W. Froehlich, Jr., Peterson, Thelan & Price, Keith Zakarin, Lillick, McHose & Charles, San Diego, Cal., for plaintiffs-appellees.
 Schulman and Schulman by Elizabeth Schulman, Thomas H. (Speedy) Rice, San Diego, Cal., for amicus curiae, American Civil Liberties Foundation of Southern California, San Diego Chapter.
 Appeal from the United States District Court for the Southern District of California.
 Before WALLACE, NORRIS and THOMPSON, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 The Secretary of Commerce, the Administrator of the National Oceanic and Atmospheric Administration, the Assistant Administrator for Fisheries, National Fisheries Service, and the Southwest Regional Director of the National Marine Fisheries Service (government) appeal two preliminary injunctions prohibiting them from placing female observers on board commercial tuna boats owned and operated by Caribbean Marine Service Co. and Caroline M. Corp. (the owners). We have jurisdiction pursuant to 28 U.S.C. Sec. 1292(a)(1), and we reverse.
 
 
 2
 * The owners and certain crew members (crew) fish for yellow fin tuna using purse seine nets. To locate the tuna, they scan the water looking for porpoises, which for unknown reasons often swim with the tuna. Nets are set around the porpoises, and the tuna swimming beneath them are captured when the net is closed or "pursed" around them. During this procedure, many porpoises may be caught in the nets and drowned. In 1970 and 1971, for example, more than 600,000 porpoises were killed in the course of such operations. See Balelo v. Baldrige, 724 F.2d 753, 756 (9th Cir.) (en banc) (Balelo ), cert. denied, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984).
 
 
 3
 In 1972, Congress enacted the Marine Mammal Protection Act (Act), 16 U.S.C. Secs. 1361-1406. One of the declared goals of the Act is to reduce the number of incidental kills and injuries to marine mammals permitted in the course of commercial fishing operations. Id. Sec. 1371(a)(2). In furtherance of this goal, section 1372 of the Act prohibits the killing or "taking" of any marine mammal except in accordance with permits issued by the Secretary of Commerce (Secretary). Id. Sec. 1372. Section 1373 directs the Secretary to prescribe regulations regarding permitted takings of marine mammals and authorizes the Secretary to set quotas restricting the number of porpoises that may be taken pursuant to such permits each year. Id. Sec. 1373.
 
 
 4
 Pursuant to section 1373, the Secretary promulgated regulations requiring permit holders to allow an employee of the National Oceanic and Atmospheric Administration (Administration) to accompany fishing vessels "for the purpose of conducting research and observing operations, including collecting information which may be used in civil or criminal penalty proceedings, forfeiture actions, or permit or certificate sanctions." 50 C.F.R. Sec. 216.24(f)(1) (1986). In Balelo, this court, sitting en banc, held that the Secretary did not exceed the scope of his authority in promulgating this regulation and that the placement of observers aboard the vessels did not constitute an unreasonable warrantless search within the meaning of the fourth amendment. 724 F.2d at 755.
 
 
 5
 The Administrator's new policy of hiring female, as well as male, observers to accompany selected fishing vessels on their voyages prompted the present litigation. Before 1986, the Administration did not hire women to fill positions as porpoise observers aboard fishing vessels. A number of female applicants complained of discrimination, and the Chief of the Administration's Civil Rights Division conducted an administrative inquiry into the complaints. He concluded that the practice of denying women employment on the tuna vessels solely because of their sex violated Title VII of the Civil Rights Act of 1964. Pursuant to his recommendation, the Administration began recruiting female as well as male applicants for the tuna boat observer program. Four women were recruited for the observer position in 1986 and were assigned to their first voyages in January of 1987.
 
 
 6
 In November of 1986, the Administration notified the tuna fleet that women were being trained as observers and that the female observers could be placed aboard the vessels in the near future. The letter sent to each owner stated that no alterations of the vessels or special accommodations would be required, but that any adjustments that could be made to achieve compatibility between male crew members and female observers were encouraged.
 
 
 7
 The owners were notified in December 1986 and January 1987 that a female observer would be assigned to accompany their vessels, the M/V Mariner and the M/V Apure, on their next voyages. In two separate actions, the owners and crew filed these actions for declaratory and injunctive relief. In each action, the owners and crew alleged that the Administrator's directive requiring the presence of female observers threatened a violation of the crew members' constitutional privacy rights and a violation of regulations requiring the observer to carry out his duties so as to minimize interference with fishing operations, 50 C.F.R. Sec. 216.24(f)(2) (1986). The owners and crew sought and obtained temporary restraining orders prohibiting the government from implementing its new directive. The owners and crew then moved for preliminary injunctive relief. They supplemented their motions with various declarations describing the living and working conditions on the vessels. We now summarize these declarations.
 
 
 8
 A fishing voyage may last three months or longer, depending upon fishing conditions. During this period, the crew members work together on the deck of the boat, eat and drink together in the small galley, and are otherwise forced to interact with one another in their bunkrooms, in the passageways, and in the common showers and toilets.
 
 
 9
 The crew members allegedly enjoy little or no privacy with respect to intimate bodily functions. They share small, dormitory-style bunkrooms and common toilets and showers. Because the bunkrooms are cramped, the crew members usually undress in the common area of the bunkroom, rather than behind curtains in their bunks. Moreover, because the common toilets and showers lack partitions or curtains, they usually bathe and perform other bodily functions in view of their cabinmates. Though single and double cabins equipped with private bathrooms exist on the vessels, these are assigned to officers. Porpoise observers usually bunk with the crews and share their bathroom facilities; thus, these observers may both observe and be observed by the crew members while undressing or performing bodily functions.
 
 
 10
 In addition, the crew members allegedly expose their bodies to the view of other members of the boat's complement while working on deck. Declarations submitted by the owners and crew state that crew members sometimes remove their clothes on deck, urinate over the side of the deck, shower on deck, and use unenclosed toilets on the deck. The porpoise observer, while conducting observation duties on deck, may have occasion to view these activities as well.
 
 
 11
 Finally, the declarations state that the West Coast tuna fishing industry has suffered severe financial losses in the past few years. The declarations contend that the presence of a female observer could destroy morale and distract the crew, thus affecting the crew's efficiency and decreasing the vessel's profits. The declarations also express the owners' concern that the crew members, some of whom are allegedly crude men with little formal education, may harass or sexually assault a female observer. Such tortious conduct could subject the owners to uninsurable liability, and further endanger their profits. To support this allegation, the owners referred to an incident which occurred aboard a foreign vessel involving an assault by a Korean officer upon an American female who served as a foreign fishing observer. Finally, the owners claimed that officers would have to devote time to protecting the female observer from the crew, thus distracting them from their primary duty of locating and catching tuna.
 
 
 12
 The owners and crew argued that these declarations were sufficient to call into question the constitutionality of the Administration's order requiring that the owners permit female observers to accompany their vessels on extended fishing voyages. Due to the captains' practice of assigning government observers to bunk in the dormitory bunkrooms and the crew members' habit of undressing, showering, and relieving themselves on deck, the crew members allegedly would be forced to expose their naked bodies to the view of the observer both above and below the deck. They contended further that even if this indignity could be avoided, the female observer's very presence in common areas of the vessel, such as the dining area, would unconstitutionally infringe the crew members' alleged right to privacy in these areas.
 
 
 13
 The owners also contended that declarations stating that the presence of a female would create conflicts that would disrupt fishing operations raised a serious legal question regarding the legality of assigning females as observers under 50 C.F.R. Sec. 216.24(f)(2) (1986). This regulation requires that the duties of the observer be performed in a manner that minimizes interference with fishing operations. The owners contended that this regulation should be interpreted to require the government to refrain from placing female observers on board vessels because the mere presence of a woman on the ship would distract the crew and affect its efficiency.
 
 
 14
 The government responded to these averments by submitting declarations challenging the owners' and crew's assertion that an invasion of the crew members' privacy interests was unavoidable and that the female observer would disrupt fishing operations. With respect to the crew members' privacy claim, the government submitted declarations pointing out that Administration regulations do not require that observers be placed in shared bunkrooms, that private quarters on tuna vessels may remain vacant throughout a fishing voyage, and that both male and female observers had been assigned private accommodations on boats in the past. Declarations from both male and female observers stated that crew members were always partially dressed while performing their duties, and that they had never observed crew members taking showers on deck.
 
 
 15
 With respect to the owners' claim that the presence of a female would disrupt fishing operations and provoke jealousy and fights, the government submitted the declaration of Wendy Townsend, a female Administration observer, who completed a 48-day voyage aboard a tuna seiner, which, like the owners' vessels, is subject to the Administration's directive. She stated that though the vessel's navigator vacated his quarters for the observer's use, he expressed no resentment at her presence and that they established a comfortable working rapport. Townsend also stated that she established amicable relations with the crew members, that no harassment or other disturbing incidents took place during her voyage, and that the crew members succeeded in capturing a hold-full of fish during the voyage.
 
 
 16
 The government also challenged the owners' prediction that the presence of a female observer would subject the owners to ruinous liability for the tortious conduct of their employees. It relied on Townsend's statement that she experienced no problems with the crew members. The government also submitted the declaration of Janet Wall, a foreign fisheries observer since 1978, who stated that approximately one-third, or about 150, of the observers serving on foreign vessels each year are women, and that in the past ten years there had been only six instances of physical or verbal abuse of female observers on these vessels. Finally, the government contended that the owners and officers, rather than the government, were responsible as a matter of law for the conduct of their crews, and that the owners could not be heard to complain of financial injuries which might result from the tortious conduct of their own employees.
 
 
 17
 The district court granted the motions of the owners and crew for preliminary injunctions in each case. The district court found that the parties raised serious privacy questions, and a serious question concerning the legality of placing women on the vessels under 50 C.F.R. Sec. 216.24(f)(2) (1986). The district court determined that the balance of hardships tipped sharply in favor of the owners and crew. The court decided that the injunction would merely preserve the status quo, and this was important considering "the fact that the tuna industry is not as viable as it once was." In addition, the court concluded that maintenance of the status quo allowing only male observers "will not adversely effect the purpose of the [Act], namely the preservation of porpoise."
 
 II
 
 18
 When reviewing an order issuing a preliminary injunction, an appellate court must determine whether the district court applied the proper legal standard in issuing the injunction and whether it abused its discretion in applying that standard. Sports Form, Inc. v. United Press International, Inc., 686 F.2d 750, 752 (9th Cir.1982) (Sports Form ). An injunction may also be set aside if the district court misapprehended the law in its preliminary assessment of the merits, or premised its conclusions on clearly erroneous findings of fact. Id. Absent one of these errors, the district court's decision will not be reversed merely because the appellate court would have arrived at a different result if it had initially applied the law to the facts of the case. Id.
 
 
 19
 Because our review of the district court's decision is generally limited to whether the district court abused its discretion, our disposition of an appeal from a preliminary injunction ordinarily will not dispose of the merits of the litigation. Id. at 753. "Because of the limited scope of our review of the law applied by the district court and because the fully developed factual record may be materially different from that initially before the district court, our disposition of appeals from most preliminary injunctions may provide little guidance as to the appropriate disposition on the merits." Id.
 
 
 20
 In some cases, such appeals unnecessarily delay the litigation and waste judicial resources. Id. In this case, for example, the government moved to stay discovery in the underlying litigation pending our disposition of this appeal. To the extent that a desire to get an early glimpse of our view of the merits of the underlying legal issues in this litigation motivated this tactic, it was both misconceived and wasteful. A preliminary injunction is, as its name implies, preliminary to the trial--not to an appeal. We believe that this case could have proceeded to trial, or to the summary judgment stage, in less time than it took the parties to submit these cases for appeal. Had the parties pursued this course, they would have achieved a prompt resolution of the merits. But the parties did not pursue this course; therefore, we are conducting our review on the basis of a limited record. On the basis of this limited record and the status of the litigation, we may do no more than determine whether the district court abused its discretion in determining that serious legal questions were raised and that the balance of hardships tipped sharply in favor of the owners and crew. Our resolution of these issues will not determine the merits of the underlying legal issues presented in this litigation, and will only temporarily affect the rights of the parties. Id. When the district court renders its judgment on the merits of these cases, the losing party may again appeal. Id. Thus, rather than delay all proceedings during the pendency of an appeal from an order granting a preliminary injunction, the parties should have sought a rapid resolution of the legal issues presented in this case by moving for summary judgment or proceeding to a trial. Unfortunately, the parties did not take seriously our strong suggestion in Sports Form.
 
 III
 
 21
 We now consider the question whether the district court abused its discretion in granting the preliminary injunction in this action. Identifying the proper test that should be applied by the district court is not always easy. Our cases have emphasized, however, that when the public interest is involved, it must be a necessary factor in the district court's consideration of whether to grant preliminary injunctive relief. Thus, under the "traditional test" typically used in cases involving the public interest, the district court should consider (1) the likelihood that the moving party will prevail on the merits, (2) whether the balance of irreparable harm favors the plaintiff, and (3) whether the public interest favors the moving party. Northern Alaska Environmental Center v. Hodel, 803 F.2d 466, 471 (9th Cir.1986). We have allowed the district court some latitude in assessing the first two factors as it fashions appropriate relief. In some cases, we have stated that a plaintiff may meet its burden by demonstrating a combination of probable success on the merits and a possibility of irreparable injury. E.g., Los Angeles Memorial Coliseum Commission v. National Football League, 634 F.2d 1197, 1201 (9th Cir.1980) (L.A. Coliseum ). At other times, we have stated that where the balance of hardships tips decidedly toward the plaintiff, the district court need not require a robust showing of likelihood of success on the merits, and may grant preliminary injunctive relief if the plaintiff's moving papers raise "serious questions" on the merits. Id. at 1201, 1203 & n. 9. This latter formulation is known as the "alternative test." Under either test, however, the district court must consider the public interest as a factor in balancing the hardships when the public interest may be affected. See id. at 1200; see also American Motorcyclist Association v. Watt, 714 F.2d 962, 967 (9th Cir.1983) (AMA).
 
 
 22
 In the case before us, the district court did not find that the owners and crew were likely to prevail on the merits. Instead, it only considered the seriousness of the questions raised and the balance of the hardships between the parties. After examining the moving papers, the court concluded that the owners and crew raised serious questions on the merits and that the balance of hardships tipped sharply in their favor. The government urges us to find that the district court erred in each of these determinations. However, we need not reach the question whether the owners and crew raised serious questions on the merits before the district court. Our review of the legal questions, as important as they are, will need to await a trial on the merits of this case and any subsequent appeal. We may properly dispose of the appeal before us by considering whether the district court properly evaluated and weighed the relevant harms in this case.
 
 A.
 
 23
 In his Memorandum Decision, the district judge cited four findings in support of his conclusion that the balance of harm tipped sharply in favor of the owners and crew: (1) the preliminary injunction would do no more than "preserve the status quo"; (2) the tuna industry "has been plagued with financial problems"; (3) the female observer would "disturb the domestic aspect of the tuna seiner"; and (4) the declarations submitted by the owners and crew "speculate that accommodation of a female federal observer may be costly."
 
 
 24
 These findings do not support the district court's conclusion that the balance of harm tipped decidedly in favor of the owners and crew. First, and perhaps most important, the owners and crew did not demonstrate, and the district court did not find, that the alleged harms will be irreparable. At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm. L.A. Coliseum, 634 F.2d at 1202-03. Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. Goldie's Bookstore, Inc. v. Superior Court, 739 F.2d 466, 472 (9th Cir.1984). A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief. L.A. Coliseum, 634 F.2d at 1201.
 
 
 25
 The district court did not require a showing that the harms alleged by the owners and crew were imminent or likely. For example, the district court did not require them to demonstrate that the economic losses they alleged would result from a female observer's presence were likely to occur. Instead, the court merely stated that "the declarations submitted by the [owners] speculate that accommodation of a female observer may be costly " (emphasis added). Nor do the materials that the owners submitted demonstrate an imminent threat of economic harm. The owners offered no evidence that female porpoise observers would interfere with fishing operations on their vessels. Instead, the owners simply stated that their employees would respond negatively to a female observer and that this subjective response might cost the owners money. The owners also feared that their employees would assault or harass the observer and thereby subject them to an increased risk of liability. Neither of these allegations suffices to establish an imminent threat of economic injury.
 
 
 26
 The only evidence submitted to substantiate the owner's prediction that they would incur increased liability for intentional torts were materials describing an assault on an American female foreign fisheries observer by a Korean officer on a Korean ship. The possibility that a female observer aboard one of the owners' vessels would suffer a similar attack at the hands of the owners' employees and thus subject the owners to liability is too remote and speculative to constitute an irreparable injury meriting preliminary injunctive relief.
 
 
 27
 In City of South Lake Tahoe v. California Tahoe Regional Planning Agency, 625 F.2d 231, 233 (9th Cir.) (South Lake Tahoe ), cert. denied, 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980), we held that council members' fears that enforcing regulations would expose them to civil liability did not give them standing to challenge the regulations. Id. at 238-39. We held that because "multiple contingencies" must occur before the alleged injury occurred, the threat of civil liability was only potential. We concluded that because there was "no immediate threat of suit nor reason to believe suit [was] inevitable," the injury the council members alleged was too speculative to constitute an "injury in fact" for standing purposes. Id. at 239. See also O'Shea v. Littleton, 414 U.S. 488, 497, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974) (O'Shea ) (plaintiffs lacked standing to complain of an injury that would occur only "if [they] proceed[ed] to violate an unchallenged law and if they [were] charged, held to answer, and tried in any proceedings.").
 
 
 28
 We find the reasoning of these standing cases persuasive because the issues involved in this claim are similar. The owners claim that their increased exposure to liability constitutes economic injury. This claim appears indistinguishable from those alleged in South Lake Tahoe and O'Shea. Multiple contingencies must occur before their injuries would ripen into concrete harms. Here, as in South Lake Tahoe, there is no threat of suit nor reason to believe suit is inevitable. Id. at 239; see also O'Shea, 414 U.S. at 498, 94 S.Ct. at 677. In addition, we must assume that the owners and their employees will not willfully violate criminal assault laws or commit intentional torts against the observer. O'Shea, 414 U.S. at 497, 94 S.Ct. at 676. Because the threat of civil liability is too attenuated and conjectural to constitute a basis for their standing, South Lake Tahoe, 625 F.2d at 239, it follows that this injury is too speculative to constitute an irreparable harm justifying injunctive relief. See L.A. Coliseum, 634 F.2d at 1201 (plaintiffs must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief; they need only allege such injury to establish their standing).
 
 
 29
 The owners' and crew's claim that they will catch fewer fish if a woman is on board is similarly unsupported. The only materials submitted to the district court describing the impact of women on fishing operations were declarations the government filed stating that women have served successfully on numerous voyages on both foreign and American fishing vessels. Subjective apprehensions and unsupported predictions of revenue loss are not sufficient to satisfy a plaintiff's burden of demonstrating an immediate threat of irreparable harm. See id. at 1201-02. Moreover, there was no showing that the threat to the owners' revenues constituted an irreparable injury. No consideration was given to whether any lost revenues might be compensable in a damage award, and thus not irreparable. Id. at 1202. Indeed, the district court did not make any finding on whether the alleged threat to the owners' revenues would be irreparable. Therefore, the district court abused its discretion by including the economic harm the owners and crew alleged in its calculus when balancing the hardships alleged by the parties.
 
 B.
 
 30
 The district court similarly failed to find a threat of immediate, irreparable harm to the privacy interests alleged by the crew. The district court did not find, for example, that the female observer would have to bunk in the crew's quarters or observe their intimate bodily activities. Instead, the district judge stated in conclusory fashion that though a "male federal observer did not disturb the domestic aspect of the tuna seiner, a female would." It is unclear from this description whether the "harm" the court found consisted of an invasion of any constitutionally protected privacy interests or mere inconvenience to the crew members. Injunctions should not issue "to restrain an act the injurious consequences of which are merely trifling." Weinberger v. Romero-Barcelo, 456 U.S. 305, 311, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982), quoting Consolidated Canal Co. v. Mesa Canal Co., 177 U.S. 296, 302, 20 S.Ct. 628, 630, 44 L.Ed. 777 (1900). If the owners and crew demonstrated only a likelihood that the crew members would be inconvenienced by having to adapt to the presence of a woman, but failed to establish an imminent threat to their privacy interests, the district court abused its discretion by resorting to the extraordinary remedy of enjoining the operation of the governmental program in this case.
 
 
 31
 The government urges us to find that the owners and crew failed to demonstrate a likelihood that the presence of a female observer would implicate constitutionally protected privacy interests. It points out that the Administration does not require that the federal observer be housed with the crew members and that the crew members' privacy in their bedrooms could be ensured by the simple step of assigning the female observer to a private cabin. It argues further that the crew did not allege, much less demonstrate, that the presence of a female observer in other areas of the ship would implicate any constitutionally protected interest.
 
 
 32
 We agree with the government that mere allegations of inconvenience will not support the crew members' claim of irreparable injury to their constitutional rights. We will not, however, decide whether the owners and crew have raised serious constitutional issues in this appeal. Because we cannot determine from the district court's decision whether the district court found that a female observer would infringe any constitutionally protected privacy interests, we need not reach that issue.
 
 C.
 
 33
 The district court also failed to mention the harm that the government might suffer from a preliminary injunction, and thus did not weigh that harm against any alleged privacy interests of the crew members. The district court must "identify the harms which a preliminary injunction might cause to defendants and ... weigh these against plaintiff's threatened injury." L.A. Coliseum, 634 F.2d at 1203.
 
 
 34
 The only indication in the district judge's opinion that he considered whether the injunction would harm the government is his statement that the injunction would do no more than preserve the status quo. This brief statement does not identify specific injuries alleged by the government or weigh those injuries against those alleged by the owners and crew. In fact, however, the government did allege that enjoining the placement of female observers on board the ships would cause specific injuries to governmental interests.
 
 
 35
 The government alleged that its ability to enforce the mandate of the Act would be hampered if it were prohibited from placing qualified members of the observer program aboard West Coast vessels. It also alleged that its failure to employ women in the observer program could subject it to liability for a violation of Title VII of the Civil Rights Act of 1964. The district court's decision does not indicate that it considered, much less weighed, this harm against the injuries alleged by the owners and crew. This failure to identify, evaluate, and weigh the potential harm alleged by the government is reversible error. L.A. Coliseum, 634 F.2d at 1203.
 
 D.
 
 36
 Finally, the district court failed to identify and weigh the public interests at stake in its balance of harms analysis. As stated earlier, the district court must always consider whether the public interest would be advanced or impaired by issuance of an injunction in any action in which the public interest is affected. AMA, 714 F.2d at 967.
 
 
 37
 The owners and crew argue that delaying either temporarily or permanently the use of women in the Act's observer program would not have any impact on the interests of the public. This argument rests on two premises: first, that the only public interest implicated by this dispute is the interest in preserving marine mammals, and second, that excluding qualified women from the observer program will not negatively affect that interest. Though the district court's analysis of the balance of harms does not indicate whether it considered or balanced the interests of the public in this case, it appears that the district court accepted the assertion of the owners and crew that excluding women from the observer program would not affect the primary purpose of the Act. The court stated that "the maintenance of the status quo by allowing exclusively male observers to accompany the plaintiffs' tuna seiners will not adversely affect the purpose of the [Act], namely the preservation of porpoise."
 
 
 38
 The argument that the injunction would have no impact on the interests of the public fails to take into account both the government's and the public's interest in ensuring equal employment opportunities for women. This interest, as well as the interest in protecting and preserving marine mammals, is clearly implicated by the issuance of the preliminary injunction in this case. See, e.g., Kent v. Johnson, 821 F.2d 1220, 1225 (6th Cir.1987) (operational necessity of nondiscrimination in employment is, by definition, a legitimate penological objective which must be balanced against inmates' alleged rights to privacy); Forts v. Ward, 621 F.2d 1210, 1215-17 (2d Cir.1980) (Forts ) (district court must balance the Title VII rights of guards against the privacy rights of inmates even where no Title VII action has been filed). The district court acknowledged that this action "implicated" the policies underlying Title VII. However, there is no indication that the district court weighed the strong governmental and public interest in nondiscriminatory hiring practices by the government against the privacy interests asserted by the crew. This omission fatally undermines the district court's conclusion that the balance of hardships tips decidedly in favor of the owners and crew. L.A. Coliseum, 634 F.2d at 1203.
 
 
 39
 When the governmental and public interest in gender-neutral hiring is balanced against the privacy interests asserted in this case, it is by no means apparent that the balance tips decidedly in the crew members' favor. Some courts have held that the privacy interest in remaining free from involuntary viewing of private parts of the body by members of the opposite sex should not impair employment rights unless the threatened invasion of privacy is serious and there are no means by which both interests can be reasonably accommodated. See, e.g., Grummett v. Rushen, 779 F.2d 491, 495 (9th Cir.1985) (restricted observations by members of the opposite sex are not so degrading as to require intervention by a federal court); Forts, 621 F.2d at 1216-17 (threat to privacy must be of sufficient gravity to justify denial of equal employment opportunities); Smith v. Fairman, 678 F.2d 52, 54-55 (7th Cir.1982) (per curiam) (conflict between privacy interest of inmates and state's duty to refrain from discrimination in employment of guards ordinarily should be resolved by reasonable accommodations), cert. denied, 461 U.S. 907, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983). Therefore, we cannot automatically say, based on the record before us, that the privacy interests "decidedly" outweigh the important governmental interest in providing equal employment opportunities for its employees, especially if the threat to the privacy interests asserted can be minimized by taking reasonable steps to prevent the threatened intrusions.
 
 
 40
 In the present case, the district court's decision does not indicate that the court considered whether less drastic alternatives were available that could accommodate both the crew members' alleged privacy interests and the governmental and public interest in gender-neutral hiring. If such alternatives are available, the crew members' alleged privacy claim may be reduced to no more than a claim of inconvenience. See Forts, 621 F.2d at 1217 (interests in style and avoiding discomfort do not justify denial of equal employment opportunities). We therefore cannot determine from the scant record before us what, if any, effect the female observer's presence would have on the crew members' alleged right to be free from involuntary observation of their intimate activities and whether this harm decidedly outweighs the governmental and public interests threatened by the issuance of the preliminary injunction. We trust these issues will be properly developed during the trial.
 
 IV
 
 41
 In conclusion, after careful review of the record and the district court's decision, we hold that the district court abused its discretion by ordering preliminary relief in this case. Under the alternate approach articulated in L.A. Colisuem, the moving party must first demonstrate an immediate threat of irreparable injury to itself and that the balance of hardships tips decidedly in its favor. Id. at 1203. The district court did not determine that the injuries alleged by the owners and crew were serious, immediate, and irreparable. Moreover, it failed to identify the harm which a preliminary injunction might cause to the government, its employees, and the public and to weigh this harm against any irreparable injuries alleged by the owners and crew. We therefore reverse the orders granting preliminary injunctions.
 
 
 42
 REVERSED.