PILE DRIVERS, DIVERS, CARPEN-
TERS, BRIDGE, WHARF AND DOCK
BUILDERS LOCAL UNION 34, et al.,
Plaintiffs,

v.

NORTHERN CALIFORNIA CARPEN-
TERS REGIONAL COUNCIL and Unit-
ed Brotherhood of Carpenters and Join-
ers of America, Defendants.

No. C 97-2277 TEH.

United States District Court,
N.D. California.

Sept. 5, 1997.

James E. Eggleston, M. Jane Lawhon, Eggleston, Soegel & LeWitter, Oakland, CA, Gordon K. Hubel, Los Angeles, CA, for Plaintiffs.

Patrick T. Connor, Daniel J. Hall, De Carlo, Connor & Selvo, Los Angeles, CA, for Defendants.

## ORDER

HENDERSON, Chief Judge.

This matter comes before the Court on plaintiffs' application for a preliminary injunction. Having considered the oral argu-

ments and written submissions of the parties, the Court issues the following order.

## FACTUAL BACKGROUND

The instant dispute arises from an intra-union reorganization effort by defendant United Brotherhood of Carpenters and Joiners of America ("UBC"). As part of a nationwide effort to consolidate certain administrative activities at a regional, rather than local, level, UBC General President Douglas McCarron on May 27[1] created defendant Northern California Carpenters Regional Council ("Regional Council") and directed all local unions within its geographic bounds to affiliate with it. Pile Drivers, Divers, Carpenters, Bridge, Wharf and Dock Builders Local Union No. 34 falls within the newly-created Regional Council's jurisdiction.[2] After receiving notice of the UBC affiliation directive, Local 34 on June 14 held a meeting of its membership. At this meeting, the members present voted unanimously to reject the affiliation.

Thereafter, Local 34 fought the affiliation on two fronts. Utilizing internal union procedures, the Local filed an appeal of the affiliation order with the UBC General Executive Board. On June 30, the UBC General Executive Board heard and denied Local 34's appeal. On June 16 and 19, Local 34 received letters from UBC General President McCarron indicating that the Local's refusal to comply with the affiliation directive was "contrary to the welfare of the UBC" and that a hearing to impose supervision over the local would be held on July 8. On that date, a hearing committee appointed by General President McCarron heard testimony from representatives of Local 34, the UBC, and the Regional Council. On July 21, Local 34 was notified that the hearing committee had recommended supervision over Local 34, and that the UBC General Executive Board had accordingly ordered the imposition of a trusteeship.

In addition to its internal union effort, Local 34 also opened a second front in the courts by filing this suit on June 18 against the UBC and Regional Council. On June 26, Local 34 filed an application for temporary restraining order (TRO) seeking to block the affiliation directive. Although the Court denied that application as premature, Local 34 on August 1 renewed its application for a TRO, now seeking to block both the affiliation directive and trusteeship. The Court on August 7 granted Local 34's application and heard argument on the motion for preliminary injunction on August 25.

## LEGAL STANDARD

According to Ninth Circuit precedent, in order to obtain a preliminary injunction, the moving party must demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the movant.[3] *Associated General Contractors*, 950 F.2d at 1410. These formulations are not different tests but rather two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases. *Id.* A party seeking a preliminary injunction, however, must always show "as an irreducible minimum that there

1. Unless otherwise noted, all dates refer to events in 1997.

2. Local 34, its officers, and several of its rank and file members constitute the plaintiffs in the instant action and shall be collectively referred to as "Local 34" herein.

3. The Second Circuit has modified the traditional requirements for preliminary injunctive relief in the union trusteeship context, in light of the presumption of validity that these trusteeships enjoy under 29 U.S.C. § 464(c). *See International Bhd. of Teamsters v. Local No. 810*, 19 F.3d 786, 789–90 (2d Cir.1994) (reciting modified standard where international sought preliminary injunctive relief enforcing trusteeship); *National Ass'n of Letter Carriers v. Sombrotto*, 449 F.2d 915, 923 (2d Cir.1971) (same); *Mason Tenders Dist. Council v. Laborers' Int'l Union*, 884 F.Supp. 823, 832 (S.D.N.Y.1995) (setting out standard applicable when local seeks preliminary injunctive relief blocking trusteeship). The Ninth Circuit, however, has stated that the statutory presumption of validity "does not substantially change the showing necessary to obtain a preliminary injunction." *Benda v. Grand Lodge of Int'l Ass'n of Mach. & Aero. Workers*, 584 F.2d 308, 316 n. 4 (9th Cir.1978). Bound by this authority, the Court applies the traditional standards governing preliminary injunctive relief.

is a fair chance of success on the merits." *Johnson v. California State Bd. of Accountancy,* 72 F.3d 1427, 1430 (9th Cir.1995). In considering a request for a preliminary injunction, a court must remain mindful that such relief is aimed primarily at preserving the status quo pending trial. *See Los Angeles Mem. Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1200 (9th Cir.1980) ("fundamental principle" governing preliminary injunctive relief is the need to maintain the status quo prior to determination on the merits). In balancing the harms, a court must also take into account any public interests implicated by the injunctive relief sought. *Caribbean Marine Services Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir.1988).

## DISCUSSION

### A. Likelihood of Success on the Merits

■ Before turning to the particular facts of this case, the Court notes the "well-established federal policy of avoiding unnecessary interference in the internal affairs of unions." *Local 1052 v. Los Angeles County Dist. Council of Carpenters,* 944 F.2d 610, 613 (9th Cir.1991) (quoting *Motion Picture & Videotape Editors Guild, Local 776 v. International Sound Tech., Local 695,* 800 F.2d 973, 975 (9th Cir.), *amended,* 806 F.2d 1410 (9th Cir. 1986)). In the words of the Ninth Circuit, "Disputes between an international and its locals ... are best left for internal settlement." *Motion Picture & Videotape Editors,* 800 F.2d at 976; *accord Local 1052 v. Los Angeles County Dist. Council of Carpenters,* 944 F.2d 610, 617 (9th Cir.1991).

In unraveling the arguments of the parties in this case, the Court has endeavored to keep this general federal policy of noninterference in mind. Here, an international union is seeking to reorganize the structure of its locals, a process that can be expected to generate internal frictions from time to time. If dissident locals were allowed to repair immediately to federal court for a second-opinion regarding the wisdom of every reorganization effort, the long-standing federal policy of noninterference in internal union affairs would be reduced to empty rhetoric. At the same time, as Local 34 correctly points out, federal law does impose certain limits on the wide-ranging autonomy enjoyed by international unions. At root, this case turns on the difficult question of where exactly to draw the line between the two competing principles.

■ Local 34 seeks to block both the UBC's affiliation directive and the ensuing trusteeship.[4] With respect to the trusteeship, as the Court explained in the Order granting the TRO, judicial review is limited. *See* Order at 3–4 (filed Aug. 7, 1997). Congress, in passing Title IV of the Labor–Management Reporting and Disclosure Act (LMRDA), created a 18–month statutory presumption of validity for trusteeships properly imposed on subordinate locals.[5] 29 U.S.C. § 464(c). In order to defeat the statutory presumption of validity, a local under supervision must generally produce clear and convincing evidence of bad faith on the part of the international in imposing the supervision. *See Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers,* 584 F.2d 308, 313 (9th Cir.1978); 29 U.S.C. § 464(c). In its prior Order, the Court concluded that Local 34 failed to meet this burden. Because Local 34 has not supplemented the record with any additional evidence of bad faith in connection with the trusteeship proceedings, the Court reaffirms this finding.

■ A trusteeship may also be challenged if clear and convincing evidence

---

4. Local 34 seeks to enjoin both the UBC and the Regional Council from taking any actions to implement the affiliation directive. The resolution of the instant motion, however, turns on the validity of the affiliation directive, which was issued by the UBC. Local 34 has not suggested an alternative, independent theory of liability against the Regional Council. Accordingly, the Court, in the balance of this Order, will focus its analysis on the conduct of the UBC.

5. In its August 7, 1997 Order, the Court found that, based on the evidence produced by the parties at that time, the trusteeship over Local 34 was established "in conformity with the procedural requirements of [UBC's] constitution and bylaws and authorized ... after a fair hearing ... before the executive board," as required by 29 U.S.C. § 464(c). Local 34 has not produced any additional evidence that would undermine the procedural propriety of the trusteeship, and the Court thus reaffirms its earlier finding.

indicates that it has been established or maintained for a purpose not enumerated in 29 U.S.C. § 462. *See Benda,* 584 F.2d at 316 ("A trusteeship established for a purpose not enumerated in the statute would present quite serious questions worthy of litigation."). According to the statute, the allowable purposes for the imposition of trusteeship include "correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of [the] labor organization." 29 U.S. § 462. Although this statutory enumeration has been described as "imprecise," *Benda,* 584 F.2d at 316, it is clear that a trusteeship may not be imposed in order to secure an illegitimate end. *See, e.g., Lynn v. Sheet Metal Workers' Int'l Ass'n,* 804 F.2d 1472, 1480 (9th Cir.1986), *aff'd,* 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989); *Benda,* 584 F.2d at 316–17 & n. 6.

The record here indicates that the trusteeship over Local 34 was imposed in order to secure the local's compliance with the UBC affiliation directive. In light of the above legal authorities, the question thus becomes whether that directive was itself legitimate. Put another way, if the affiliation directive is illegitimate, it cannot be redeemed via the imposition of a trusteeship meant to effect the same outcome. Accordingly, the Court turns to a consideration of the UBC affiliation directive that sparked the instant dispute.

■ The UBC's authority to reorganize its subordinate locals flows from Section 6A of its constitution, which provides:

> The United Brotherhood is empowered ... in the discretion of the General President subject to appeal to the General Executive Board, where the General President finds that it is in the best interests of the United Brotherhood and its members, locally or at large, to establish or dissolve any Local Union or Council, to merge or consolidate Local Unions or Councils, ... and to permit, prohibit, or require the affiliation with

> or disaffiliation from any Council by any Local Union....

This constitutional provision, which the Court treats as an enforceable contract between the international and its locals, *see Local 1052,* 944 F.2d at 613, bestows substantial discretion on the UBC General President with respect to intraunion organization. As a result, locals resisting the UBC's ongoing regional reorganization efforts have not fared well in court. *See United Brotherhood of Carpenters and Joiners of America, Dresden Local 267 v. United Bhd. of Carpenters & Joiners,* 992 F.2d 1418 (6th Cir.1993) (affirming judgment against local that was dissolved by UBC after resisting reorganization effort); *Local 1052 v. Los Angeles County Council of Carpenters,* 944 F.2d 610 (9th Cir.1991) (affirming summary judgment against 4 locals merged into larger regional UBC organization); *Local 48 v. United Bhd. of Carpenters & Joiners,* 920 F.2d 1047 (1st Cir.1990) (affirming summary judgment against local merged into another UBC local); *Millwright Local 1079 v. United Bhd. of Carpenters & Joiners,* 878 F.2d 960 (6th Cir.1989) (same); *Local 657 v. Sidell,* 552 F.2d 1250 (7th Cir.1977) (affirming judgment against local ordered to affiliate with newly-formed UBC regional council). These cases make it plain that, absent bad faith, *see Local 48,* 920 F.2d at 1053, General President McCarron has the authority to order a local to affiliate or merge with a regional council. Under the terms of the UBC Constitution, the affected locals do not have a right to vote on the matter, *see Local 1052,* 944 F.2d at 615, and may in fact be dissolved if they resist a reorganization directive, *see Local 267,* 992 F.2d at 1423.

In this case, Local 34 has not produced any evidence suggesting that the reorganization was tainted by bad faith on the part of the UBC. It is undisputed that the affiliation directive issued to Local 34 was part of a larger Northern California reorganization effort, which was, in turn, part of a nation-wide UBC reorganization effort that has been ongoing for a number of years. By reorganizing its locals into larger regional councils, the UBC hopes to make the union reflect an increasingly regional construction market-

place, hopes to increase efficiency by eliminating administrative redundancies, and hopes to redirect resources from administration into organizing efforts.

Accordingly, on the basis of the preliminary record, the Court finds that the affiliation directive comported with the requirements of the UBC Constitution and was not issued in bad faith. As noted earlier, this finding generally would mark the end of the judicial inquiry. Local 34, however, has mounted a novel legal defense, apparently of first impression, that requires additional attention. According to Local 34, the affiliation directive here is illegitimate, despite the lack of bad faith, because it constitutes a breach of the UBC's statutory duty of fair representation.

■ The duty of fair representation is a judicially-developed doctrine rooted in a series of cases involving racial discrimination by bargaining representatives against those they represent. *See Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). In the seminal case of *Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), the Supreme Court considered the plight of black locomotive firemen who were represented by a majority-white labor organization seeking to amend a collective bargaining agreement so as to eliminate black firemen from the craft. *Id.* 323 U.S. at 195. The Supreme Court of Alabama approved the union's conduct, holding that federal labor statutes vested plenary power in the bargaining representative, "without any legal obligation or duty to protect the rights of minorities from discrimina-

tion or unfair treatment, however gross." *Id.* at 198. In rejecting this position and reversing the Alabama court, the United States Supreme Court concluded that with the privilege of acting as exclusive bargaining representative comes an inseparable duty of good faith:

> It is a principle of general application that the exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf. . . .

*Id.* at 202. In light of *Steele* and its progeny, the Supreme Court has declared that a bargaining representative has "a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. at 177. Accordingly, it is now well-established that a union, when acting as exclusive bargaining representative, owes its members a statutory duty of fair representation, a breach of which entitles the aggrieved employees to relief in the courts as well as before the National Labor Relations Board ("NLRB").[6] *See Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991); *Vaca v. Sipes*, 386 U.S. at 178–88.

The duty of fair representation has been applied to a wide range of union activities. *See, e.g., Steele, supra* (reviewing racially discriminatory seniority system); *Vaca v. Sipes, supra* (reviewing union's decision not to proceed with a grievance); *Breininger v. Sheet Metal Workers Int'l Ass'n, Local No. 6,*

---

6. The Regional Council and UBC have argued that the Court lacks jurisdiction over the instant motion, insofar as it seeks injunctive relief. *See San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244–45, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) ("When an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board. . . ."). The *Garmon* preemption doctrine, however, does not apply where an employee claims that a union has breached the statutory duty of fair representation. *See Breininger v. Sheet Metal Workers Int'l Ass'n, Local No. 6*, 493 U.S. 67, 74–80, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989); *Vaca v. Sipes*, 386 U.S. at 178–88. Defendants respond that Local 34's duty of fair

representation argument requires the Court to decide a threshold question regarding representation, which should properly be decided by the NLRB. The Court rejects this preemption argument for two reasons. First, *Vaca* holds that *Garmon* preemption does not apply to fair representation suits, and the Supreme Court has "never suggested that the *Vaca* rule contains exceptions based on the subject matter of the fair representation claim presented, the relative expertise of the NLRB in the particular area of labor law involved, or any other factor." *Breininger*, 493 U.S. at 76. Second, because the Court does not believe that the fair representation analysis here requires an extensive detour through representation issues, *see infra*, the rationale of the *Garmon* preemption doctrine is inapplicable.

493 U.S. 67, 87–89, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989) (reviewing union's operation of a hiring hall); *Air Line Pilots Ass'n, supra* (reviewing terms of strike settlement negotiated by union). Local 34, however, admits that it has uncovered no published authorities that have measured an intraunion affiliation order against the statutory duty of fair representation. The Court, for its part, has also been unable to locate any precedents squarely on point.

As a threshold matter, then, Local 34 asks that this Court apply the duty of fair representation where it has never been applied before—to an international union's internal reorganization efforts. The UBC responds by emphasizing that it has never acted as the exclusive bargaining representative for Local 34's members, and thus the corollary statutory duty ought not apply. Internationals, however, have been held to owe a duty of fair representation directly to members of its locals where actions of the international directly affect the collective bargaining rights of union members or supplant the autonomy of the local. *See Alexander v. International Union of Oper. Eng'rs*, 624 F.2d 1235, 1240–41 (5th Cir.1980). Local 34 points out that by issuing the directive in this case, the UBC effectively required that the members of Local 34 adopt a new bargaining representative, the newly-formed Regional Council. When Local 34 refused and filed actions with the NLRB seeking to block the affiliation, the UBC imposed a trusteeship. The appointed trustee then attempted to withdraw the NLRB petitions previously filed by Local 34. In Local 34's view, the affiliation directive, if implemented, will have a substantial impact upon members' rights in relation to the negotiation and administration of the collective

bargaining agreement, thus justifying judicial intervention and the imposition of the duty of fair representation. *See Retana v. Apartment, Motel, Hotel and Elevator Operators Union, Local No. 14*, 453 F.2d 1018, 1024–25 (9th Cir.1972) (holding that internal union policies are subject to duty of fair representation where they have "substantial impact on members' rights in relation to the negotiation and administration of the collective bargaining agreement").

■ The Court, however, need not definitively resolve this difficult question because, even assuming that the statutory duty of fair representation applies to intraunion affiliation directives, it does not appear to have been breached here. The duty of fair representation is breached "only when a union's conduct . . . is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. at 190. Local 34 has not alleged that the UBC, in ordering affiliation, has acted in a discriminatory manner. The affiliation directive, after all, applied equally to all UBC locals in Northern California. Local 34, as explained above, has also produced no evidence of bad faith on the part of the UBC in ordering the affiliation. It is on the last prong of the *Vaca v. Sipes* formulation that Local 34 relies—Local 34 contends that the affiliation directive was arbitrary.[7]

According to the Supreme Court, "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n*, 499 U.S. at 67 (internal quotes and citation omitted).[8] This is a particularly demanding stan-

---

7. Local 34 also argues that the UBC's affiliation directive, because it will result in consequences so dire to Local 34 members, *see infra*, constitutes bad faith. Because this position boils down to an allegation that the UBC acted recklessly, the Court finds that this argument is more properly analyzed under the arbitrariness standard, rather than under a bad faith theory.

8. Local 34 also argues for a less deferential standard, rooted in "hiring hall" cases, wherein unions are held to a "high standard of fair dealing" when operating a hiring hall. This heightened standard of care, however, is rooted in the union's double role as representative and employer.

*See Breininger*, 493 U.S. at 88–89. In the instant case, Local 34's arguments notwithstanding, the UBC's is not acting as an employer when it makes decisions regarding the organization of its local units. If a union in its representative capacity must have broad discretion in contract negotiations, *see Air Line Pilots Ass'n*, 499 U.S. at 78, it must enjoy at least the same discretion in the organization of its internal structure, *see Financial Inst. Employees*, 752 F.2d at 363 (noting federal policy of noninterference in internal union affairs extends to affiliation decisions). Thus, to the extent the "hiring hall" cases set a standard of care in excess of that set out in *Air Line*

dard, and appears to be consonant with the cases noted above that counsel deference to an international's decisions with respect to internal union structure. *See, e.g., Local 1052,* 944 F.2d at 613; *Financial Inst. Employees v. N.L.R.B.,* 752 F.2d 356, 362–63 & n. 9 (9th Cir.1984) (emphasizing that federal policy of nonintervention in internal union affairs extends to affiliation decisions), *aff'd,* 475 U.S. 192, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986). Thus, the Court asks whether the UBC's affiliation directive, in light of the factual and legal landscape in May and June, can be characterized as irrational.

Local 34 argues that the affiliation directive fails this test for two reasons. First, according to Local 34, the affiliation directive necessarily raises a "question concerning representation," which in turn would allow employers to walk away from existing Local 34 contracts, thus jeopardizing the livelihood of Local 34's membership. In light of this catastrophic result, Local 34 declares that the affiliation order is irrational. Second, Local 34 contends that the affiliation effectively modifies numerous provisions of Local 34's existing contractual obligations without affording Local 34's members their contractually-guaranteed opportunity to ratify such modifications.

In connection with the first argument, Local 34 points to 27 affidavits it has gathered from Northern California contractors. Of these contractors, all of whom are signatories to collective bargaining agreements with Local 34, 19 state that they will consider themselves released from their contractual obligations should the affiliation move forward. The remaining 8 state that they "may" consider themselves released. According to Local 34, the departure of only the 19 contractors who have announced their intention to walk away from the Local 34 agreements would result in a loss of 19,000–30,000 hours of work for Local 34 members per month, which would translate into hundreds of jobs for Local 34's members. This job loss, in turn, would result in the irretrievable loss of certain pension and health benefits.

These contractors would be justified in walking away from their Local 34 agree-ments, according to Local 34, because the affiliation necessarily raises a "question concerning representation." *See NLRB v. Financial Institution Employees,* 475 U.S. 192, 199, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986) (referring to two-part NLRB test for continuity of representation). Under current law, an affiliation may effect a union's status as exclusive bargaining representative of employees and its relationship with employers. *See generally Financial Inst. Employees,* 752 F.2d at 360–61; Kenneth A. Sprang, *Much Ado About Nothing: NLRB Regulation of Union Affiliation Elections,* 19 N.Y.U. REV.L. & SOC.CHANGE 1, 7 (1992). In order to determine whether the post-affiliation entity is entitled to the protections of the National Labor Relations Act ("NLRA"), the NLRB applies a two-part test, asking first whether the affiliation procedure afforded members adequate "due process," and second whether "a continuity of representation" exists between the pre– and post-affiliation entity. *Financial Inst. Employees,* 752 F.2d at 360–61. The NLRB's jurisdiction is generally invoked either when the post-affiliation union seeks to amend its certification, or when an employer refuses to bargain with the post-affiliation entity and raises the question concerning representation as a defense in an ensuing unfair labor practice action. *See* Sprang, *supra,* at 9–10.

Here, Local 34 argues that, in its post-affiliation incarnation, it will not pass muster under either prong of the NLRB test. With respect to the "due process" prong of the test, for example, Local 34 notes that despite near-unanimous membership disapproval, the UBC did not afford the rank and file an opportunity to vote on the affiliation directive. Plaintiffs also argue that Local 34's bylaws will be substantially altered by the affiliation, and that the fundamental changes effected by the new bylaws necessarily preclude a finding of "continuity of representation." As a result, when employers abandon their existing contracts with Local 34, the Regional Council will be unable to hold them to these agreements in any subsequent NLRB proceeding. The loss of Local 34 jobs will inexorably follow, as the contractors

*Pilots Association,* they do not control situations such as this one.

abandon Local 34 for other unions or non-union workers.

The Court declines Local 34's invitation to predict the outcome of a potential NLRB proceeding that might be initiated in response to employer actions that have not yet come to pass. While the affiliation directive here did lack certain "due process" features, it also appears to be consistent with the UBC Constitution, a document that contractually binds Local 34 and its members. Local 34, moreover, has not cited any NLRB authority squarely on point that would control the outcome of the hypothetical proceeding it describes. After closely examining the positions of both sides, the Court is unable to divine what result might attend a potential NLRB representation proceeding and is chary of invading that body's exclusive jurisdiction over such matters.

■ More importantly, Local 34 has misconstrued the Court's role in evaluating whether the UBC breached its duty of fair representation by ordering affiliation. An analysis of the UBC's duty in this case does not permit the Court to independently speculate regarding the possible outcome of a representation dispute before the NLRB. As noted earlier, in order to show that the UBC's affiliation directive breached the statutory duty of fair representation, Local 34 must demonstrate that the directive was, "in light of the factual and legal landscape at the time, ... so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n*, 499 U.S. at 67. By embarking on its regional reorganization, the UBC was running the risk of displeasing employers who had bargained with the pre-affiliation locals. The relevant question, however, is not whether *the Court*, viewing the matter with the benefit of hindsight,[9] believes that the benefits of reorganization outweighed the risk; rather, the question is whether *the UBC*, in light of the factual and legal landscape at the time it issued the affiliation directive and imposed a trusteeship, could rationally conclude that the reor-

ganization was worth the risk of employer dissatisfaction. The anticipated benefits of reorganization were outlined in a report prepared by Michael Draper, a member of the General Executive Board of the UBC, after studying the UBC's operations in the Northern California area. Mr. Draper concluded that regional reorganization would result in administrative savings and would permit the union to direct additional resources to organizing, a priority for the UBC. Counterbalancing these benefits were the risks of employer resistance, many of which Local 34 has highlighted. With respect to these risks, however, it is undisputed that, in the course of the UBC's recent nation-wide reorganization efforts involving the affiliation of more than 200 independent unions with regional councils, no employer has attempted to repudiate existing agreements, much less succeeded in demonstrating that the reorganization raised a "question concerning representation." As a legal matter, moreover, Local 34 has not cited any cases wherein the UBC's ongoing reorganization efforts resulted in the nullification of collective bargaining agreements that were negotiated by a pre-affiliation local. On the basis of this legal and factual landscape, it can hardly be said that the UBC acted irrationally in issuing the affiliation directive to Local 34.

Furthermore, as a policy matter, the Court is concerned that accepting Local 34's argument here would effectively permit employers, via threats of contract repudiation, to veto the internal reorganization efforts of the UBC. This result would not be consistent with federal labor policy. *See Financial Institution Employees*, 475 U.S. at 209 (rejecting NLRB rule because it "effectively gives the employer the power to veto an independent union's decision to affiliate, thereby allowing the employer to directly interfere with union decisionmaking Congress intended to insulate from outside interference."). Here, a rational motivation animated the Northern California reorganization effort.

---

**9.** The Court wonders, moreover, how much useful "hindsight" is provided by 27 declarations regarding the future intentions of contractually-bound employers. In other words, even in the face of these declarations, it may well be rational for the UBC to proceed with the affiliation, if for no other reason than to resist this effort by employers to dictate the terms of its internal reorganization efforts.

Even assuming that the UBC should have foreseen the possibility that the affiliation of Local 34 might raise a "question concerning representation," in light of its previous experience and the state of the law, the Court cannot say that the UBC's decision to proceed was irrational. In the face of *employer* resistance, as opposed to *membership* resistance, a union's discretion to make adjustments to its internal structure must be, if anything, more wide-ranging. Thus, where the members are bound by a union constitution to obey an affiliation directive and the affiliation directive rests on a rational basis, the threats of employers cannot transform the otherwise legitimate affiliation order into an irrational act that violates the duty of fair representation. This bootstrapping would, in the end, get the entire analysis backward—permitting employers to dictate internal union affairs.

Local 34 also has articulated a second theory to support its position that the affiliation directive constitutes an arbitrary act. According to Local 34, an affiliation would necessarily modify certain provisions of Local 34's existing collective bargaining agreements,[10] without affording Local 34's membership the opportunity to ratify such modifications, as is their contractual right. Accordingly, Local 34 urges the Court to hold that, because the affiliation directive necessarily infringes on plaintiffs' contractual right to ratify any modifications to existing collective bargaining agreements, the directive is arbitrary and thus a violation of the UBC's duty of fair representation.

The trouble with this argument is that the contract modifications are not the direct result of the affiliation order. Rather, the "modifications" that Local 34 complains of stem from the new bylaws adopted by the Regional Council. In other words, "it was the adoption of the Council bylaws, not the reorganization, that eliminated the Local's right" to ratify contract modifications. *Local*

*267*, 992 F.2d at 1424 (addressing elimination by a regional council of the local's prior right to elect its own business representatives). Under Section 6A of the UBC Constitution, Local 34's members had no right to vote on the affiliation directive. *See Local 1052*, 944 F.2d at 615. Assuming that the affiliation was valid, the Regional Council, as successor to Local 34, had the power to eliminate the right to ratify contract modifications and to consolidate authority in its own hands, subject to the procedural requirements of its bylaws. In summary, "since the new council's bylaws were properly adopted, this prior right of [Local 34] was not eliminated improperly." *Id.*

As explained above, a party seeking a preliminary injunction must make a showing regarding both likelihood of success and irreparable injury. In order to succeed on the merits, Local 34 faces a daunting legal task. To prevail, it must demonstrate that the UBC affiliation directive constitutes a breach of the duty of fair representation. This, in turn, requires that they show the affiliation directive was arbitrary—that it was "so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n*, 499 U.S. at 67. Given the evidence presented in this case and the UBC's prior reorganization experiences, it does not appear that Local 34 is likely to meet this stringent legal standard. The Court thus concludes that Local 34, while it has articulated a coherent legal theory that might yet prevail at trial, has not at this preliminary stage shown a likelihood of success on the merits.

### B. Balance of Hardships

Where a party seeking a preliminary injunction has failed to establish a probability of success on the merits, but has raised serious questions coupled with at least some chance of success, she may nevertheless prevail if she can demonstrate that the balance of hardships tips sharply in her favor. *Car-*

---

**10.** Whereas under existing agreements Local 34 had sole authority over its contracts, the Regional Council has adopted bylaws that shift this final authority into its own hands. For example, under existing agreements, Local 34 chooses representatives that will sit on the Board of Adjustment in arbitration proceedings. According to

the new bylaws enacted by the Regional Council, the Regional Council will choose these representatives. More importantly, Local 34 previously had the exclusive control over the negotiation of contracts. Under the new Regional Council bylaws, this control passes to the Council.

**1148**

*ibbean Marine Svcs. Co.*, 844 F.2d at 674 (referring to this as the "alternative test"). In loading its side of the scales, Local 34 conjures the image of its contract employers abandoning their collective bargaining agreements *en masse*, thus throwing hundreds of Local 34 members out of work. While this would certainly constitute a serious harm, it is a speculative harm at this point. Before this scenario comes to pass, the contractors would have to make good on their promise to walk away from their existing contracts *and* defeat the UBC in a "question concerning representation" proceeding before the NLRB. *Cf. Caribbean Marine Svcs. Co.*, 844 F.2d at 675 (rejecting district court's finding of irreparable harm where multiple contingencies would have to occur before harm could occur); *New York v. Nuclear Reg. Comm'n*, 550 F.2d 745, 756–57 (2d Cir.1977) (harm is too speculative to support injunction where it comes only at the end of a causal chain of contingencies). Despite Local 34's arguments to the contrary, it is not obvious to the Court that the NLRB would find that "a question concerning representation" has been raised in this case. Until the NLRB so rules, any dissatisfied employers will be held to the terms of the existing contracts, which extend into the year 2000.

█ Although Local 34's injury is somewhat speculative, the UBC and Regional Council have made an even weaker showing regarding the harms that they will suffer should the Court grant a preliminary injunction.[11] Both defendants argue that an injunction would interfere with the regional reorganization effort and with the Regional Council's ability to represent its members in future contract negotiations. These allegations, however, fail to descend into specifics. Local 34, for example, has traditionally negotiated its own contracts with employers that supplement the Carpenter's Master Agreement. The Court is not persuaded that the UBC or Regional Council will suffer irreparable harm if this practice continues—the

Regional Council would represent all the locals except Local 34, which would continue to negotiate its own supplemental agreements. Neither defendant, moreover, has explained what hardship, exactly, would result from "interference" with the reorganization effort. A party seeking to tip the preliminary injunction scales must go beyond allegations and actually demonstrate that a particular harm is imminent. *See Caribbean Marine Svcs. Co.*, 844 F.2d at 674 ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.") (emphasis in original). Obviously, if the Court were to grant the preliminary injunction, the Regional Council could not negotiate on behalf of Local 34's members. However, what concrete harm, if any, this would cause to the UBC or the other locals represented by the Regional Council is not developed in the papers.

In balancing the harms in this case—speculative on the one hand and underdeveloped on the other—the Court is satisfied that the scale tips in Local 34's favor. Given the speculative nature of the harm it alleges, however, Local 34 has not demonstrated that the balance tips *sharply* in its favor.

## CONCLUSION

In light of the Court's doubts regarding Local 34's chances of success on the merits, the speculative possibility of irreparable harm to the local is not enough to support preliminary injunctive relief in this case.

Accordingly, the preliminary injunction is HEREBY DENIED. It is FURTHER ORDERED that the temporary restraining order entered by the Court on August 7, 1997 is HEREBY VACATED.

**IT IS SO ORDERED.**

---

**11.** The public interest, however, favors the UBC. As discussed above, federal labor statutes make it clear that a policy of judicial noninterference in internal union affairs fosters the public interest. *See Financial Inst. Employees*, 752 F.2d at 362 (finding that affiliation decisions are internal un-

ion matters and noting "longstanding federal labor policy of avoiding unnecessary interference in internal union affairs"). Injunctive relief here, especially insofar as it was premised on the threats of Local 34 employers, would be inconsistent with this federal policy.