COALITION FOR CANYON PRESER-
VATION, INC., and Resources
Limited, Inc., Plaintiffs,

v.

Donald E. HAZEN, Colonel, in his capacity as District Engineer, U.S. Department of the Army Corps of Engineers, Omaha District; James N. Hall, in his official capacity as Division Engineer for Western District Federal Highway Administration; and Frontier West, Inc., Defendants.

No. CV 90–141–M–CCL.

United States District Court,
D. Montana,
Missoula Division.

Dec. 28, 1990.

Jon L. Heberling, McGarvey, Heberling, Sullivan & McGarvey, Kalispell, Mont., for plaintiffs.

Chris Swartley, Missoula, Mont., Jim Zotter, Federal Highway Adm., Portland, Or., Mike Riley, U.S. Army Corps of Engineers, Omaha Dist., Omaha, Neb., Kris McLean, Asst. U.S. Atty., Helena, Mont., for defendants.

## OPINION AND ORDER

LOVELL, District Judge.

The court denied Plaintiffs' application for temporary restraining order and preliminary injunction. This opinion explains the reasons for the court's ruling.

## BACKGROUND

Plaintiffs filed their application seeking to stop the Federal Highway Administration (FHWA), the Army Corps of Engineers, and Frontier West from constructing a replacement bridge across the North Fork of the Flathead River near Polebridge, Montana. Plaintiffs allege defendants have violated various procedural requirements of the Clean Water Act, the Wild and Scenic Rivers Act, and the National Environmental Policy Act (NEPA). In essence, plaintiffs are opposed to construction of the bridge for two reasons: first, the location of the proposed bridge 350 feet upstream from the old site allegedly will cause significant impact to the wild and scenic river values of the North Fork, and second, the proposed two lane bridge should be a one lane bridge, which in their opinion, is more consistent with the historic and natural qualities of the area.[1]

In 1988, the Red Bench forest fire destroyed several major structures in the Polebridge developed area of Glacier National Park. The bridge at Polebridge which crosses the North Fork of the Flathead River, a wild and scenic river, was among those structures destroyed. Since the Polebridge area is a major access point to Glacier, the Park Service budgeted emergency funds to replace the structures and embarked on an accelerated planning schedule for the area which included preparing an environmental assessment (EA) to determine if replacement of the buildings and bridge would result in any significant adverse impacts.

---

1. Specifically, plaintiffs cite seven violations, all stemming from the Corps of Engineers issuance of the 404 permit for the bridge project: that a public hearing should have been held pursuant to 33 CFR 327.4; that the public interest and emphasis on protecting the values of the river were not properly considered pursuant to 33 CFR 320.4(a) and (j); that other practicable alternatives were not considered as required by 33 CFR 230.10; that the environmental impact statement should have been completed; and finally that the Federal Highway Administration violated its own regulation that all applicable laws be followed when it proceeded with the bridge construction in light of the various alleged violations.

On August 1, 1989, the Park Service made a finding of no significant impacts and determined it would proceed with replacement of the structures at Polebridge, Montana.

Because the proposed bridge would be placed across a navigable stream, the FHWA with which the Park Service had entered into an agreement to install the bridge, made application to the Corps of Engineers for a 404 permit under the Clean Water Act. On April 25, 1990, the Army Corps of Engineers notified the public that the FHWA had applied for a 404 permit for the bridge project.

Based on its environmental assessment, the Corps determined that there would be no significant adverse impacts from the project and issued the 404 permit.

Thereafter the FHWA received bid solicitations for construction of the bridge and issued a contract on November 7, 1990, to Frontier West. Frontier West began to move its material and equipment onto the job site in order to start work in early December and plaintiffs filed suit against defendants.

DISCUSSION

 To prevail on its motion for preliminary injunction, plaintiffs must show (1) probable success on the merits, (2) possible irreparable injury, 'and (3) a public interest favoring plaintiff. *Caribbean Marine Services Co. v. Baldrige,* 844 F.2d 668 (9th Cir.1988). A plaintiff may meet its burden by demonstrating a combination of probable success on the merits and a possibility of irreparable harm. *Id.* at 674. In the alternative, where the balance of hardships tips decidedly toward the plaintiff, the court need not require a robust showing of likelihood of success on the merits and may grant relief if the plaintiff's moving papers raise "serious questions" on the merits. *Id.*

 Here, the scale does not decidedly tip in plaintiffs' favor. Although plaintiffs may be able to show some immediate disturbance to the river, the facts indicate such effects will not be serious or perma-

nent. Moreover, the testimony of the Park Service and the construction contractor show that if the plaintiffs were successful in obtaining at least one of their stated objectives, i.e., placement of the bridge at the old location, the present temporary bridge would have to be removed and yet another temporary "work" bridge would need to be installed, to facilitate construction of the permanent bridge at the old site. Thus, considerably *more* disturbance of the river would occur under plaintiffs' proposal.

Although plaintiffs argue that the proposed bridge at the new site would have long-term effects on the natural, historic and aesthetic values, plaintiffs are not the only ones concerned. According to FHWA, the bridge currently in place is a temporary structure with an estimated life of five to ten years. Without significant maintenance to both the bridge super and substructure, there is risk of structural and hydraulic failure,[2] i.e., the bridge could fall apart. As the Park Service noted in its EA, the bridge at this location provides 24,000 members of the public with entry to Glacier National Park each year. If the bridge project is stopped, the public will continue to be exposed to problems of safe and inadequate access to and from the Park. Finally, the evidence shows that bridge contractor, Frontier West, as well as several subcontractors could suffer substantial financial loss if the court were to grant the restraining order.

Because the balance of hardship does not tip decidedly toward the plaintiffs, they must do more than raise serious questions by their motion. In this case, the court finds that plaintiffs have not demonstrated a likelihood of success on the merits and for the reasons set forth below, the court denied their application to enjoin temporarily and permanently defendants from constructing the bridge across the North Fork of the Flathead River.

1. Failure to take a "hard look":

 Citing various statutory and regulatory violations, Plaintiffs allege that Defen-

**2.** FHWA letter (June 22, 1990) (commenting on the 404 permit).

dant Corps of Engineers failed to give primary emphasis to the wild and scenic river values; to consider other relevant values; to consider practicable alternatives; and failed to perform an environmental impact statement.

The basis for each of these allegations is that the Corps failed to take the requisite "hard look" at the project. *Foundation for North American Wild Sheep v. U.S.*, 681 F.2d 1172 (9th Cir.1982).

In support of these allegations, plaintiffs called Sharlon Willows, a member of the Coalition for Canyon Preservation and Resources Unlimited. She testified that the Corps failed to consider the wild and scenic river values when it chose the new site 350 feet upstream from the old site where the Coalition insists the bridge should be built, to avoid new impacts. Significantly, in response to a question from the court concerning public safety, Ms. Willows conceded that the new bridge must be a two lane structure. In addition, she stated she was not opposed to the design or configuration.[3] The bridge is a low profile bridge that utilizes a single pier and will be constructed from colored, rough finished concrete, weathering steel and rustic log guardrails.

Ms. Willow stated that in her opinion the old site is part of the historic value of the area because a bridge has been located at that site since 1916. Moreover, the approach to the Park is historic because the crossing leads directly to the Polebridge ranger station.

Plaintiffs then called Marcella Sherfy, the Montana State Historic Preservation Officer, who testified there were at least two buildings near the bridge which had been listed on the National Historic Register, thus showing that historic values exist in the area. Ms. Sherfy admitted, however, that neither the old bridge nor the

site were on the Historic Register. When asked to comment on the Corps 404 permit in July, 1990, her office responded that the design and size of the proposed bridge were inappropriate and that there were other choices available with less impact on the historic and cultural values such as reusing a metal truss bridge.[4]

The Corps responds that all of the relevant values and practicable alternatives were considered and since both the National Park Service EA as well as the Corps EA found no significant impact would result, an environmental impact statement was unnecessary.

The Corps argues it relied in part on the National Park Service EA, and filled in those areas where the Corps thought more information was needed. The United States called Robert Dunkley, who is in charge of long-term planning for Glacier National Park and also coordinates Federal Highway projects.

Dunkley testified that after the Red Bench Fire, the Park Service saw an immediate need to replace the facilities, including the bridge, at Polebridge because the area is a major public access point to Glacier National Park.

The Park Service prepared an EA pursuant to the National Environmental Policy Act (NEPA). The EA outlined various alternatives, including a no action alternative, for the replacement of the structures. The Park Service ultimately selected the alternative which would replace most of the structures including the bridge. The bridge would be constructed 350 feet upstream from the old bridge location.

The Park Service made the EA available for the standard 30–day public comment and review beginning June 3, 1989. Three hundred copies of the plan were mailed to people who had expressed an interest in the North Fork planning process. In addition,

---

**3.** One day after the hearing, plaintiffs' counsel communicated to the court that Ms. Willows was testifying on behalf of the Canyon Coalition and not Resources Unlimited even though she is a member of both organizations.

**4.** In the Mt SHPO letter of comment to the Corp on the permit, however, her office notes "We

concur with your finding that the project is unlikely to directly impact any prehistoric resources [and that] the project will not have an effect on the qualities that contribute to the significance of the remaining Register-listed Polebridge Ranger Station buildings." (Plaintiffs exhibit 5).

the Service held an open house at the community center near Polebridge in order to take comment from the local residents interested in the plan. According to Dunkley, there was substantial support for the preferred alternative but there was also objection to the size and design of the bridge, with those objecting preferring a one lane bridge rather than a two lane bridge. Importantly, there was little comment on the proposed location of the new bridge.

Dunkley testified that during the planning process the Service looked carefully at the land use relationship in the entire developed area of Polebridge, not just the river corridor. There were increasing concerns about potential conflicts because the old crossing (where the temporary bridge now exists) leads directly into the Park Service residential and maintenance facilities. Consequently, the Park Service was concerned about safety problems, such as children from the employee residences playing in the road, trucks backing out of the maintenance area into oncoming traffic, and the high volume of tourist traffic using the bridge as a major access point to the Park. Security for Park employees, their residences and Park equipment was also a concern due to the nearness of the public use areas and location of the crossing.

Dunkley testified that the Service was also cognizant of the wild and scenic river values when looking at location, as well as bridge design. Simultaneously with the planning process, the National Park Service began discussions with the Federal Highway Administration on the design and specifications for the replacement bridge with two criteria in mind: that the bridge minimize the effect on the river by keeping the number of piers to a minimum and that the bridge design be as rustic as possible to blend in with the natural and historic values of the area.

The Federal Highway Administration responded with a range of alternatives which included a wood truss bridge requiring five piers, a thirty foot high steel bridge requiring four piers (the type of bridge recommended by the Mt. SHPO), and a concrete/steel bridge requiring only one pier located out of the low water channel of the river. The one pier bridge was particularly attractive to the Park Service because of its minimum effect on the water quality and fisheries compared with the effects of the multi-pier bridges. Moreover, the single pier could be placed between the high water mark and the low water mark thus avoiding conflicts with the floaters in the summer. Furthermore, work on the pier could be done with minimal work in the water.

The Park Service also coordinated the proposal with the United States Fish and Wildlife Service which found the location would cause no adverse impacts to threatened and endangered species. The Montana SHPO found no adverse impacts to prehistoric sites or the remaining historical sites listed on the National Register for Historic Places and Sites. Although the Montana SHPO stated that depending on the design of the bridge, it may be incompatible with the historic setting, the SHPO did not object to the location of the bridge.

Significantly, Dunkley also testified that an additional reason for the selection of the site was that it facilitated construction without building another temporary bridge. If the old site were to be used, the present temporary bridge would have to be torn out and another temporary bridge constructed to allow heavy equipment to cross the river. The additional construction would result in significantly more disturbance to the river.

It appears to the court, based on the testimony by the Park Service, that impacts on the natural, historic and aesthetic values of the area as well as effects on sedimentation and fisheries were considered by the Park Service. Turning then to the environmental assessment prepared by the Corps, it further appears that the Corps also considered the potential adverse effects of the project. The Corps considered using a one lane bridge rather than a two lane bridge, the temporary bridge versus the new bridge, and a no action alternative; and the new site location ver-

sus the old site; The Corps also addressed issues raised through public comment.

The Corps found that the two-lane design was safer than the single lane because it provided adequate sight distance on the approaches. Safety is one of the specified values to be considered under 33 CFR 320.-4(a); Continued use of the temporary bridge was rejected because of the short life span of the bridge due to structural and hydraulic considerations and because the bridge needs to be available to other public agencies for emergencies such as the one which occurred when the Red Bench fire destroyed the original bridge.

The single pier design of the proposed bridge was preferred because of the improvement over the old bridge design which required four piers in the river. The Corps also agreed with and adopted the Park Service's analysis that a no action alternative was unacceptable because it would deny public access at a significant and traditional park entrance.

The Corps also rejected the steel truss bridge recommended by the Montana SHPO because it would require as many as four piers in the river causing considerable impact to river resources. Moreover, the Corps found this type of steel bridge would stand thirty feet high, overshadowing the natural features of the area, while the proposed bridge would be a low profile bridge designed with colored rough finish concrete, weathered steel and rustic log guardrails to blend in with the aesthetic qualities of the river corridor and historic nature of the surrounding area.

Based on the court's careful review and consideration of the Park Service EA and the Corps' EA, together with the testimony offered by witnesses at the hearing, the court finds that the Corps' decision to issue the permit was not unreasonable, and that the Corps did take a hard look at the relevant factors.[5]

The evidence shows the alternative selected takes into consideration safety and security of Park Service employees and property by allowing the Service to separate land use patterns in the Polebridge area. Safety is also considered in providing adequate sighting distance to cross the bridge for the nearly 24,000 people who use the crossing to access Glacier National Park.

The ultimate design of the bridge is based on consideration of historic, cultural, and scenic values associated with the entire area, including the wild and scenic river corridor. The bridge is low in profile to avoid detracting from other historic values and is rustic in design (colored rough finish concrete, log guardrails, and weathering steel) to fit in with the aesthetics of the area. Furthermore, the court observes that the Mt. SHPO, Marcella Sherfy, who raised the issue of design during the public comment period and also testified at the hearing about her opposition to the design may well have a conflict of interest in this particular project. During her testimony describing her familiarity with the area, Ms. Sherfy admitted that her husband owns property in the area. Thus, her personal family financial interest may conflict with her official position. In any event, the court did consider her testimony.

The court also finds that the location of the proposed bridge also considers impact on the wild and scenic river values.[6] The

---

**5.** Among the listed factors which may be considered, if relevant, are: conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shoreline erosion and accretion, recreation, water supply and conservation, water quality, energy needs safety, food and fiber production, mineral needs, considerations of property ownership and, in general the needs and welfare of the people. 33 CFR 320.4(a).

**6.** Plaintiffs argue that 33 CFR 320.4(a) requires a careful weighing of the "primary" factors

(aesthetic, scenic, historic, archaeologic, and scientific) which are emphasized under the Wild and Scenic Rivers Act. 16 U.S.C. § 1281. Plaintiffs miss the relevant regulation specifically dealing with wild and scenic rivers. 33 C.F.R. Section 320.4(e) states that full evaluation of public interest requires *due consideration* be given to the effect a structure or activity may have on values such as those associated with wild and scenic rivers. Nothing in the regulation suggests primary emphasis must be given to these particular values but rather all twenty

one pier design avoids conflicts with recreational floaters because the pier will be located out of the low river channel. Although construction of any bridge would result in sedimentation and intrusion in the river, the effects are held to a minimum where one pier is involved and that pier can be constructed when the water is below the ordinary high water mark. Finally, the proposed location will result in considerably less impact on the river because the existing temporary bridge can be utilized to facilitate construction thus avoiding construction of another temporary work bridge.

Findings by the federal and state agencies, including the Environmental Protection Agency and the U.S. Fish and Wildlife Service state that issuance of the permit would result in no significant adverse impacts, further suggesting the Corps did not fail to take a hard look at the crucial factors.

 Plaintiffs claim the agency decision is unreasonable because the Corps failed to prepare an environmental impact statement. An agency decision may be unreasonable if plaintiffs allege facts, which if true, show that the proposed project *may* significantly degrade some human environmental factor and the agency failed to prepare an environmental impact statement. *Foundation for North American Wild Sheep v. U.S.*, 681 F.2d 1172 (9th Cir.1982). Under this case, a determination that significant effects on the human environment *will in fact occur* is not essential. *Id.*

Here, however, plaintiffs are not able to point to impacts which rise to a level of significant. The fact that plaintiffs suggest the project is controversial does not necessarily create a substantial question. "The term 'controversial' refers to cases where a substantial dispute exists as to the size, nature or effect of the major Federal action rather than to the existence of opposition to a use." *Id.* at 1182 (interpreting 40 CFR 1508.27(b)(4)).

values identified in § 320.4(a) which are rele-

**2. No Public Hearing on 404 permit:**

Plaintiffs also contend that the Corps did not follow its own regulations when it denied the requests for an informal hearing. Defendants respond that the decision to hold a hearing is discretionary and that because the agency had enough information to make an informed decision without further comment, a hearing was unnecessary.

Plaintiffs rely upon two cases, *Buttrey v. United States*, 690 F.2d 1170 (5th Cir. 1982) *National Wildlife Federation v. Marsh* (D.D.C.1983) for the proposition that a public hearing is required. In each case, the court found that the plaintiff was not entitled to a formal trial type hearing. The court did not hold, however, that an informal hearing was necessarily required.

 Although the failure of the Corps to grant a hearing is regrettable, the court finds that the Corps' decision not to hold a hearing was not unreasonable. A court is not empowered to substitute its judgment for that of an agency. *Citizens to Preserve Overton Park, Inc v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Id.* Here, the applicable regulation governing whether or not to hold a hearing states: "a public hearing *may* be held in connection with the consideration of a DA permit application or a Federal project whenever a public hearing is needed for making a decision on such permit application or Federal project." 33 CFR 327.4(a). Moreover, "requests for public hearings ... shall be granted, *unless* the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing." 33 CFR 327.-4(b). The inquiry for the court then is whether the Corps' decision not to hold a hearing was reasonable.

 The Corps analyzed the substance of the written comments received and also sought views by the National Park Service,

vant must be evaluated.

the U.S. Fish and Wildlife Service, and the Montana SHPO. None of the agencies found the proposed bridge would create significant adverse impacts to the resources within their particular area of expertise. Those concerns raised by the Montana SHPO were considered by the National Park Service, which coordinated its efforts with the Federal Highway Administration, to ensure the proposed bridge was designed to blend into the area by using weathering steel, rough finished colored concrete, and rustic log guardrails. The Park Service did conduct a public meeting.

The public made meaningful comments on the proposed alternative, and together with the comments from the federal and state agencies, the Corps had before it a record on which it could reasonably base its decision. Therefore it cannot be said that the Corps' determination that no valid interest would be served by a hearing is unreasonable.

3. Failure to provide 60 day notice and to obtain a section seven determination under the Wild and Scenic Rivers Act:

■ Plaintiffs allege that the Corps failed to give the Forest Service the 60 day notice required by 36 CFR 297.4(b). Plaintiffs concede there is no doubt the Forest Service had actual notice that the Federal Highway Administration had applied for a 404 permit to place the bridge across the North Fork of the Flathead River. In fact, the evidence shows that the Corps sent the public notice describing the project to the Department of Agriculture, United States Forest Service on April 25, 1990. Therefore, even though the Corps may not have provided the technical notice required by 36 CFR 297.4(b), the court finds this actual notice, far in excess of the required 60 days, to be sufficient notice. *See Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1022 (9th Cir.1980) (Although Corps failed to comply with NEPA by not obtaining written comments of USGS, district court should not be reversed and injunction issued on this ground).

■ The larger issue is whether the Forest Service was required to do a section 7

determination under the Wild and Scenic Rivers Act when the National Park Service had already performed an analysis of the potential effects on the wild and scenic river values for the North Fork. Although the Forest Service typically has management authority for wild and scenic rivers, Congress left the decision of management authority for the North Fork to the Secretaries of Interior and Agriculture. 16 U.S.C. § 1274(a)(13). According to the Flathead Wild and Scenic River Management Plan, the "Forest Service has been designated as the lead agency for river management activities in the classified Flathead River System. The National Park Service and the State of Montana retain management authority for their lands within the river corridor." (Plaintiffs' exhibit 13). In this particular case, the east side of the river is managed by the National Park Service while the Forest Service manages the west side. Presumably, the Park boundary would extend to the middle of the Flathead River. It is not unreasonable, then, that either agency could have management authority for this particular portion of the river. Here, the Park Service has the most significant presence in the area because it is a major access site to the Park. It is therefore not unreasonable that the Corps of Engineers would rely upon the expertise of the National Park Service to ensure that the proposed project was compatible with wild and scenic river values. In fact, it is clear from the record that the Park Service was cognizant of these values and took steps to protect the historic, scenic, aesthetic, archaeologic, and scientific features of the river. The Park Service requested the Federal Highway Administration to provide bridge designs that would blend in with the area and that would have the minimum impact on the stream. The Park Service also consulted with the Montana SHPO to ensure no prehistoric sites were involved with the site and with the United States Fish and Wildlife Service to ensure no threatened or endangered species would be adversely effected.

██ ┃ Defendants point out that the Forest Service ultimately performed a section 7 determination which reached the same conclusion as the Park Service and the Corps about the effects of the bridge project. Even though the report was not completed until November 29, 1990, the defendants argue the report complies because the Forest Service reached its conclusion before bridge construction began and therefore construction could have been stopped had the Forest Service determined there might be a significant impact to the river values. Although the court finds that a section 7 analysis by the Forest Service was unnecessary in this case because of the management responsibility of the Park Service for this portion of the river and because of the consideration the Service gave to the river values, even if it were necessary, the Corps' decision to issue the permit without the Forest Service's analysis was, at most, harmless error. It is clear from the Forest Service's report that it relied upon and agreed with the prior determinations made by the National Park Service. Furthermore, the Forest Service's report provides no new information which would have influenced the Corps to make a different decision on the 404 permit. *See Warm Springs Dam,* 621 F.2d 1017 (no harm resulted from failure to provide a particular agency with copy of DEIS for comment where result would be to lead the Corps to institute a study it has already completed and fully considered.)

4. Failure by the Federal Highway Administration to comply with the law:

Plaintiffs allege that because the Corps failed to comply with the law as set forth in plaintiffs' complaints one through six, the Federal Highway Administration is also in violation of the law. Since the court does not find the Corps violated the law as alleged by plaintiffs, their final claim is moot. Furthermore, the claim that the Federal Highway Administration must prepare environmental documents before the bridge can be installed suggests that plaintiffs would have the federal government expend endless taxpayer resources in the name of duplication.

Conclusion:

The defendants have adequately and reasonably considered the project in light of the entire public interest. Safety considerations prevent construction of the one-lane bridge sought by Plaintiffs; and protection of the scenic river values and fishery prohibits reconstruction of the bridge at the old site. It would be a travesty on the public interest to enjoin this project.

IT IS ORDERED that the clerk shall forthwith provide copies of the court's memorandum to counsel.