**SIERRA CLUB NORTH STAR CHAPTER and Voyageurs Region National Park Association, Plaintiffs,**

**and**

**City of Oak Park Heights, Plaintiff–Intervenor,**

**v.**

**Federico PENA, Secretary of the United States Department of Transportation; Rodney Slater, Administrator of the Federal Highway Administration; Bruce Babbitt, Secretary of the United States Department of the Interior; and Roger Kennedy, Director of the National Park Service, Defendants,**

**and**

**James Denn, Commissioner, Minnesota Department of Transportation; State of Wisconsin Department of Transportation; City of Stillwater, Defendant–Intervenors.**

No. 4–96–547 (ADM/JGL).

United States District Court,
D. Minnesota.

April 13, 1998.

Richard A. Duncan, Brian B. O'Neill, Elizabeth H. Schmiesing, Faegre & Benson LLP, Minneapolis, MN, appeared on behalf of Sierra Club North Star Chapter and Voyageurs Region National Park Association.

Mark J. Vierling, Eckberg, Lammers, Briggs, Wolff & Vierling, P.L.L.P., Stillwater, MN, appeared on behalf of the City of Oak Park Heights.

Paul F. Holleman, Assistant Attorney General, United States Department of Justice, appeared on behalf of the United States.

Sherry A. Enzler, Assistant Attorney General, State of Minnesota, appeared on behalf of the Minnesota Department of Transportation.

David T. Magnuson, City Attorney, Stillwater, Minnesota, argued on behalf of the City of Stillwater.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

### I. INTRODUCTION

The above-entitled matter came on for hearing before the undersigned United States District Judge on January 16, 1998, pursuant to the Minnesota Department of Transportation's ("MDOT") Motion for Partial Summary Judgment. MDOT, in conjunction with the Wisconsin Department of Transportation ("WDOT"), seeks to build a four-lane bridge across the Lower St. Croix River, a river that is part of the National Wild and Scenic Rivers System ("WSRS" or "System"). The United States Secretary of the Interior, however, through the National Park Service ("NPS"), has prevented the United States Army Corps of Engineers ("COE") and the United States Coast Guard ("Coast Guard") from issuing the necessary permits required for construction of the bridge. Issuance of the permits was blocked in the fall of 1996 by a NPS determination that the proposed bridge constitutes a "water resources project" under Section 7 of the Wild and Scenic Rivers Act ("WSRA" or "Act"), and a further determination in December 1996 that if the project were allowed to go forward it would have a direct and adverse impact on the specific values which entitled the Lower St. Croix to be included in the WSRS.

MDOT now moves for an order vacating the NPS determinations. MDOT and the City of Stillwater (hereinafter collectively referred to as "MDOT") filed memoranda in support of the motion. The Sierra Club North Star Chapter ("Sierra Club") and Voyageurs Region National Park Association ("Voyageurs"), the United States, and the City of Oak Park Heights (hereinafter collectively referred to as "Plaintiffs") filed memoranda in opposition. America Rivers, Inc., a non-profit corporation devoted to the protection and restoration of America's rivers and watersheds, also filed a memorandum in opposition as an amicus curiae. For the reasons set forth below, MDOT's motion will be denied.

### II. BACKGROUND

The WSRA was passed in 1968 to preserve selected rivers of the United States in their free-flowing condition for the benefit and enjoyment of present and future generations. 16 U.S.C. § 1271. In order to qualify for inclusion in the System a river must possess an "outstandingly remarkable" value in at

least one of the following categories: scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar attributes. *Id.* The short and relatively simple Act identifies the rivers in the WSRS, sets forth a procedure by which additional rivers may be added, and provides guidance on how the designated rivers should be managed. 16 U.S.C. §§ 1274–1284.

One of the rivers included in the System is the Saint Croix River ("St.Croix"). 16 U.S.C. §§ 1274(a)(6) and (8). The St. Croix, which extends from Solon Springs in northwest Wisconsin to its confluence with the Mississippi River in Prescott, Wisconsin, is 164 miles long and serves as the border between the States of Minnesota and Wisconsin for a significant portion of its length. Benson Aff. ¶ 5. The upper segment of the St. Croix between the dam near Taylors Falls, Minnesota, and the dam near Gordon, Wisconsin, was designated for inclusion in the WSRS in 1968. 16 U.S.C. § 1274(a)(6). At that time, the lower segment of the St. Croix between the dam near Taylors Falls and its confluence with the Mississippi River ("Lower St. Croix") was designated as a study river for potential later addition to the System. 16 U.S.C. 1276(a)(21).

Four years later, Congress passed the Lower St. Croix River Act of 1972 ("LSCRA"). Pub.L. No. 92–560 (codified at 16 U.S.C. § 1274(a)(9)). The LSCRA designated the northern 27 miles of the Lower St. Croix for immediate inclusion in the WSRS and provided for designation of the southern twenty-five miles upon application by the Governors of Minnesota and Wisconsin. *Id.* In early 1976, the Governors of both states wrote to the Secretary of the Interior requesting that the southern 25 miles be included in the system. Shortly thereafter, the Secretary designated this final segment of the Lower St. Croix a federally protected Wild and Scenic River.

Ten bridges traverse the St. Croix linking the transportation systems of Wisconsin and Minnesota. Josephson Aff. ¶ 3. One of the bridges across the Lower St. Croix is a two-lane lift bridge ("Stillwater Bridge") between Stillwater, Minnesota and Houlton, Wisconsin. The Stillwater Bridge connects Minnesota Trunk Highway 36 ("T.H.36") to Wisconsin State Trunk Highway 64 ("T.H.64"). Benson Aff. ¶ 6. In 1967, MDOT and WDOT began studying alternatives for replacement of the Stillwater Bridge due to problems associated with traffic congestion and safety. *Id.* at ¶ 16. In June 1974, however, the project had to be set aside because of funding issues and other planning priorities. Josephson Aff. Ex. G.

The project was eventually rejuvenated in February 1985 when WDOT and MDOT entered into a Cooperative Agreement for the preparation of various studies regarding a replacement for the Stillwater Bridge. Benson Aff. ¶ 17. Among the studies was a Draft Environmental Impact Study ("DEIS") required by the National Environmental Policy Act and a Section 4(f) Statement required by the Federal Transportation Act. The NPS participated in the environmental review process as a cooperating agency. Josephson Aff. ¶ 19. In March 1990, MDOT and WDOT, in conjunction with the Federal Highway Administration ("FHA"), issued a DEIS/Section 4(f) Statement for the Project. Benson Aff. ¶ 19. Following an extensive public comment period, public hearings, and the preparation of a draft Final Environmental Impact Statement ("FEIS"), an FEIS/Section 4(f) Statement was issued in April 1995. *Id.* at ¶ 21.

The FEIS identified a preferred alternative which required upgrading T.H. 36 for a new bridge approach; the construction of a new four-lane bridge over the Lower St. Croix south of Stillwater between Oak Park Heights, Minnesota and Houlton, Wisconsin; and the construction of a new bridge approach in Wisconsin ("Proposed Bridge" or "Project"). The Project would be a massive undertaking and would significantly impact the bed and banks of the river:

> Eight of the 25 bridge piers would be constructed in the bed of the St. Croix River and five would be located in an adjacent wetland on the Minnesota side. Most of the piers would be located in deep water, where the bottom substrate is soft and flocculent, however, some would be located in shallow areas with sand and gravel substrates. To construct river

piers, cofferdams would be built to dewater construction areas and either sheet piling would be driven into the river bed or caisson tubes would be inserted into drilled shafts ... Each pier, along with the cofferdams needed to construct the piers, would impact 5,145 square feet.

NPS Administrative Record ("A.R.") at 64. Additionally, construction activities would require extensive dredge and fill activity in the waterway:

Access to the river bank and water's edge would be required to build bridge piers on the bank and in the St. Croix River.... Therefore, two temporary barge docking areas are proposed to be constructed on the bed of the St. Croix River. Both would require localized dredging and filling; dredging to deepen the water sufficiently for barge access and filling to construct barge docks. One barge docking area would be adjacent to the work area on the Minnesota side of the river. Construction of this docking facility would impact a total of 2.1 acres of riverbed. About 1.5 acres of riverbed would be deepened by dredging and about 0.6 acres of riverbed would be converted to upland by filling. The filled area would be contained by a sheetpile bulkhead. A second barge docking area would be constructed under the proposed bridge on the Wisconsin side of the river. This docking area would impact about 1.5 acres of riverbed. About 0.75 acre of riverbed would be deepened by dredging, and about 0.75 acre of riverbed would be converted to upland. This filled area would also be contained by a sheetpile bulkhead.... The barge docks would be removed after bridge construction is completed.

*Id.* at 64–65 (internal citation omitted). Before the eight large piers may be placed directly in the river, MDOT must secure a "dredge and fill" permit from the COE pursuant to 33 U.S.C. § 1344. In November 1995, the FHA approved the preliminary plan for the Project, and the three primary construction contracts were scheduled to be let between November 1996 and November 1997. Benson Aff. ¶¶ 22, 25.

On June 25, 1996, Plaintiffs Sierra Club and Voyageurs commenced this lawsuit against the United States Department of Transportation, the FHA, the Department of the Interior ("DOI") and the NPS to enjoin construction of the Project. Plaintiffs alleged, among other things, that the DOI had violated Section 7(a) of the WSRA, 16 U.S.C. § 1278(a) ("Section 7"), by failing to determine whether the Project would have a direct and adverse effect upon the values for which the Lower St. Croix was included in the WSRS. In September 1996, the NPS asked the Coast Guard and the COE to put MDOT's permit requests pertaining to the Proposed Bridge in abeyance pending the outcome of an analysis of the Project under Section 7. A.R. at 132, 134. On October 2, 1996, the FHA also rescinded its authorization of the Project pending the outcome of the Section 7 determination. Josephson Aff. Ex. O.

On October 4, 1996, the Court granted leave to the States of Minnesota and Wisconsin to intervene as a matter of right as Defendants in this action. MDOT and WDOT filed answers asserting cross-claims against Interior Secretary Babbitt and NPS Director Kennedy alleging that the Interior/NPS determination that the Proposed Bridge constitutes a "water resources project" within the meaning of the WSRA, and, therefore, requires the preparation of a Section 7 evaluation, is in excess of statutory authority, contrary to law, and constitutes unauthorized rule-making in violation of the Administrative Procedures Act, 5 U.S.C. §§ 701–706.

The NPS issued a Section 7 determination of the Project on December 27, 1996. A.R. at 47–127. In a 76-page decision, the NPS determined that the Project would require modification of the bed and the banks of the river and that the Proposed Bridge would have a direct and adverse effect on the values for which the Lower St. Croix was included in the WSRS. Thus, the NPS directed the applicable Federal agencies not to issue permits, approvals, or authorizations for the Project. *Id.* at 132–137. Shortly thereafter, the State of Minnesota filed an answer and amended cross-claim against Secretary Bab-

bitt and Director Kennedy alleging that the Interior/NPS Section 7 determination is arbitrary, capricious, and in excess of statutory authority.

## III. DISCUSSION

### A. "Water Resources Project"

The first issue raised by MDOT's motion is whether the Proposed Bridge constitutes a "water resources project" within the meaning of the WSRA. Section 7 of the Act provides in relevant part:

[N]o department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration.

16 U.S.C. § 1278. The Secretary of the Interior ("Secretary") is charged with the administration of the Lower St. Croix. MDOT argues that the Secretary, acting through the NPS, erred in considering the Proposed Bridge a "water resources project" and, on that basis, conducting a Section 7 determination of the Project. MDOT claims that such a decision is contrary to the intent of Congress and an improper exercise of the Secretary's statutory authority.

The primary purpose of the WSRA is to preserve the rivers of the System in "free-flowing condition ... for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271. The Act defines "free-flowing" as "existing or flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway." 16 U.S.C. § 1286(a). With that purpose in mind, the NPS concluded that the Proposed Bridge constitutes a "water resources project" because its construction would involve "a measurable alteration of the bed and banks of the river" and would thereby "impact the free-flow of the [Lower St. Croix]..." A.R. at 69.

Judicial review of the NPS' construction of the term "water resources project" within the meaning of the WSRA involves the following two questions:

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). In determining whether Congress has directly spoken to the precise issue of whether a bridge may, in certain circumstances, be considered a "water resources project," the Court must employ traditional tools of statutory construction. *Id.* at 843 n. 9. Those tools include an analysis of the plain language of the statute, its symmetry with other related statutes, and its legislative history. *Immigration and Naturalization Service v. Cardoza–Fonseca*, 480 U.S. 421, 446–49, 107 S.Ct. 1207, 1221–22, 94 L.Ed.2d 434.

An examination of the WSRA and its legislative history reveals that Congress failed to express a clear intention of what constitutes a "water resources project" within the meaning of the Act. The term "water resources project" is not defined in the WSRA and there is no case law directly on point. *Compare Friends of the Boundary Waters Wilderness v. Robertson*, 978 F.2d 1484, 1487 (8th Cir.1992), *cert denied*, 508 U.S. 972, 113 S.Ct. 2962, 125 L.Ed.2d 662 (1993) (word "feasible" judicially defined by Supreme Court precedent to mean "physically possible"). Similarly, the legislative history of the WSRA is silent with respect to the term "water resources project" and contains only one brief comment on the topic of bridges. A report on the Act prepared by

the Senate Committee on Interior and Insular Affairs ("Committee") states:

> The bill [WSRA] has been referred to as an extension or corollary of the Wilderness Act, but its provisions are not nearly as restrictive. A national wild or scenic river area will be administered for its esthetic, scenic, historic, fish and wildlife, archeological, scientific, and recreational features, based on the special attributes of the area. However, it will not prohibit the construction of roads or bridges, timber harvesting and livestock grazing, and other uses that do not substantially interfere with public use and enjoyment of these values.

S.Rep. No. 90-491, at 4 (1967). Contrary to MDOT's contention, this solitary statement does not suffice as an unambiguous expression of approval of the construction of any bridge, no matter what its size, over any System river. Significantly, the statement does not speak directly to the definition of "water resources project." Rather, it is merely an attempt to distinguish the WSRA from the Wilderness Act by explaining that the former does not restrict development as severely as the latter. Whereas all road construction, bridge construction, timber harvesting, and livestock grazing might be prohibited in designated areas under the Wilderness Act, the Committee sought to make clear in its report that such projects and uses of the land in wild and scenic river areas would not be prohibited unless they "substantially interfere with public use and enjoyment of" the values for which a river is included in the System. The purpose of the Committee's statement, as well as the inclusion of a key qualification, renders the state-

ment ambiguous on the issue of whether bridges that require modification of the bed and banks of a System river are properly considered "water resources projects" under the Act.[1]

In an attempt to bolster its argument that Congress clearly did not intend for the WSRA to prohibit the construction of any bridges across System rivers, MDOT points to an opinion issued by the Solicitor of the Interior ("Solicitor") shortly after the Act was passed. During a discussion of the term "water resources project," the Solicitor specifically references the Senate report passage set forth above and states the following:

> The threshold inquiry in analyzing this section is the meaning of the term "water resource project." As illustrative of the issues confronting the Department in administering this section of the act, your memorandum questioned whether Corps of Engineers dredging and navigational servitude permits, transmission and gas line crossings, and highway and bridge crossings are water resource projects within the meaning of section 7.

> There is no question, in our judgment, that section 7 was not intended to apply to transmission and gas line crossings or highway and bridge construction across section 3 [designated rivers] and section 5 [study] rivers. We do not view any of these activities as the construction of a water resources project.

Memorandum from Bernard R. Meyer, Associate Solicitor, Dept. of Interior, to the Director of the Bureau of Outdoor Recreation 4

---

1. In making its legislative history argument, MDOT relies upon one other legislative statement that specifically addresses the topic of bridges in the context of the WSRA. In 1974, while arguing in favor of adding a number of his own state's rivers to the WSRS, Colorado Senator Peter H. Dominick made the following statement:

    > [I]t should be emphasized that the National Wild and Scenic Rivers Act is a multiple use act. Water resource projects are prohibited, while other uses, such as mining, hunting, fishing, timber harvesting, grazing of domestic livestock, and agricultural uses may continue. It does not prohibit the construction of roads and bridges.

    120 Cong. Rec. S33760 (daily ed. October 3, 1974) (statement of Sen. Dominick). Although

the Senator's statement directly expresses the view that bridges are not "water resources projects" under the WSRA, it comes six years after the Act's passage. Reliance upon statements of a subsequent Congress in interpreting a statute enacted by an earlier Congress is a method of interpretation that has been repeatedly condemned by the Supreme Court. *See, e.g., Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 185–86, 114 S.Ct. 1439, 1452, 128 L.Ed.2d 119 (1994) ("[w]e have observed on more than one occasion that the interpretation given by one congress (or a committee or Member thereof) to an earlier statute is of little assistance in discerning the meaning of that statute.") (internal citation omitted).

(Feb. 7, 1969) ("Solicitor's Opinion"). On that passage alone, MDOT's argument that bridges do not constitute "water resources projects" under the Act seems persuasive. The immediately subsequent portion of the Solicitor's Opinion, however, significantly undercuts MDOT's position. The opinion continues:

> In analyzing the concept of a water resource project, it must be noted that in addition to establishing a format for notification of and comment on projects requiring authorization or appropriation by Congress, section 7 also established a procedure for limiting the construction of water resource projects which do not need Congressional action and require only administrative action in the form of a grant of federal assistance. For example, Congress has in certain areas given to the various agencies and departments authority to assist, by a variety of means, projects which are not undertaken directly by the Federal Government, and therefore, are not reviewed on a case-by-case basis by the Congress. An example of this situation is Corps of Engineers dredge and fill permits.
>
> In reporting on the bill this Department stated that the term "water resource project is a very broad term which includes sewage treatment plants." ... We find nothing in the House or Senate reports or the congressional debates which indicates that Congress considered the term other than in its broadest context.

> \*  \*  \*  \*  \*  \*

Based upon these expressions by Congress [16 U.S.C. §§ 1271 and 1286(b) ], it is our judgment that a water resource project can best be defined as any type of construction which would result in any change in the free-flowing characteristics of a particular river. In this context, we consider Corps of Engineers dredge and fill permits as falling within the restrictions of section 7 of the act. To view the act otherwise could result in the complete frustration of the Congressional purpose behind this legislation which is to preserve certain rivers in their free-flowing natural condition unaffected by dredging, filling or other modification.

*Id.* at 4–5 (internal citations omitted). Thus, based on the legislative history of the WSRA and the DOI's interpretation of that history shortly following the Act's passage, it is readily apparent that neither Congress nor the DOI considered the narrow question at issue here: whether a bridge that requires COE dredge and fill permits for its construction constitutes a "water resources project" within the meaning of the Act. Because the statute is silent and the legislative history ambiguous with respect to the specific issue presented here, the Court must proceed to the second step of the *Chevron* analysis and evaluate whether the Secretary's decision to consider the Proposed Bridge a "water resources project" is based on a permissible construction of the statute.[2]

By failing to unambiguously express its intent on the issue, Congress implicitly delegated the task of deciding what constitutes a "water resources project" to the DOI.[3] In such a case, the Secretary's con-

2.  MDOT also argues that allowing the Secretary of the Interior to review the construction of certain bridges as "water resources projects" under Section 7 of the WSRA is inconsistent with Section 4(f) of the Transportation Act. Section 4(f), however, simply sets guidelines for the Secretary of Transportation to follow in determining whether to approve certain transportation programs. *See* 49 U.S.C. § 303. It does not give the Secretary of Transportation the sole authority to withhold approval of transportation projects. A construction project like the Proposed Bridge, for example, cannot go forward without a bridge permit from the Coast Guard and a dredge and fill permit from the COE. Section 4(f) of the Transportation Act does no more to vitiate Section 7 of the WSRA than it does those other Congressionally imposed requirements.

3.  The delegation is implicit, rather than explicit, because Congress did not expressly direct the DOI to define "water resources project." Instead, Congress expressly directed the Secretary to determine whether a proposed "water resources project" will have an adverse effect on the values of a System river. 16 U.S.C. § 1278. Implicit in that delegation is the authority to determine which projects fall within the meaning of the term. The DOI's construction of the term "water resources project," therefore, is only an interpretive rule, and the formal rule making requirements of the APA do not apply. *See* 5 U.S.C. § 553(b)(3)(A).

struction of the term is entitled to substantial deference. *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782 ("[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer," and a court should not disturb an agency's construction "unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."); *Sierra Club v. Davies,* 955 F.2d 1188, 1193 (8th Cir.1992) (An agency vested with policy-making power "is authorized to fill in the gaps that may have been left by Congress and this court cannot substitute its judgment for that of the agency, unless the court finds the agency's construction inconsistent with the statutory mandate or that it frustrates the purpose of Congress (Chevron Prong II)."). MDOT argues that the Court should not defer to the Secretary's interpretation of the term "water resources project" for three primary reasons: 1) the Secretary has inconsistently applied Section 7 to bridge projects in general; 2) the Secretary has inconsistently applied Section 7 to the Proposed Bridge in particular; and 3) the Secretary has failed to adopt and/or publish statements of general policy or interpretations of general applicability for the term "water resources project" in the Federal Register as required by the APA.[4]

■ The Secretary interprets the term "water resources project" to include "any type of construction which would result in any change in the free-flowing characteristics of a [wild and scenic] river." Solicitor Opinion at 5; *See also* A.R. at 69. Such an interpretation is a reasonable and permissible construction of the term. If projects that affect the free-flow of System rivers were not evaluated under Section 7, Congress' policy of preserving the rivers in their free-flowing condition would clearly be frustrated. The DOI has consistently considered bridge projects that involve construction activity in the bed or on the banks of a wild and scenic river to be "water resource projects." Haubert Decl. ¶¶ 3–4. As explained in the Solicitor's

1969 Opinion, construction activity that requires a COE dredge and fill permit inherently alters the free-flowing natural condition of the river and always triggers a Section 7 determination. Solicitor Opinion at 5. On the other hand, bridges that do not require such permits and do not affect the free-flowing characteristics of a river are not considered "water resources projects" and do not trigger a Section 7 determination. *Id.* at ¶ 5. There is no evidence in the record which shows that the DOI has been inconsistent in applying its interpretation of the term. MDOT fails to show a single bridge project involving construction in the bed or on the banks of a System river that was not considered a "water resources project" and evaluated by the DOI to ensure its compliance with Section 7.

The Secretary's consistency on the issue carried over into the NPS' approach to the Proposed Bridge. On May 22, 1987, the Acting Regional Director ("Director") of the NPS wrote the Division Administrator for the FHA "to provide continued early coordination review of the proposed St. Croix River crossing ... " Letter from William W. Schenk to Roger Borg 1 (May 22, 1987). With respect to the WSRA, the Director explained that:

> Any proposed placement of piers or other prospective physical intrusion into or modification of the river, probably including tunneling under the river, would require compliance with Section 7(a) of the Wild and Scenic River Act in addition to compliance with any other applicable environmental mandates.

*Id.* at 2. In a 1988 letter to MDOT, the NPS explained that its practice was to apply the WSRA to bridges requiring piers to be placed in the bed of System rivers despite the general statement in the 1969 Solicitor Opinion that bridges are not "water resources projects":

> While this [the 1969 Solicitor Opinion] is the guiding document for us [NPS], in practice we would probably assert that bridge piers placed in a Wild and Scenic

---

**4.** 5 U.S.C. § 552(a)(1)(D) ("Section 552") provides that agencies "shall separately state and currently publish in the Federal Register for the guidance of the public—substantive rules of gen-

eral applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency..."

River are not compatible with a designation. The practice has been to leave the actual water courses of designated segments pretty much untouched.

Letter from Chris Brown, Manager, Rivers and Trails Conservation, National Park Service, to Craig Churchwood, MDOT (Sept. 26, 1988).

Additionally, the record shows that the NPS continually asserted the applicability of the WSRA to the Proposed Bridge throughout the environmental review process. In response to statements made by MDOT in the March 1990 DEIS, the NPS wrote:

> The Federal Government is prohibited from assisting by loan, grant, or license any water resources project which would have direct and adverse effects of the values which caused the river to be designated. The Department of the Interior has interpreted permits for dredge or fill as water resources projects.

Letter from Jonathan P. Desson, Director, Office of Environmental Affairs, DOI, to Charles R. Foslien and Frank M. Mayer, Division Administrators, FHA 5 (July 10, 1990). The official comments of the NPS on MDOT's DEIS went on to explain that:

> The approval of the Department of the Interior in a direct and adverse impact determination under Section 7(a) of the Wild and Scenic Rivers Act will also be required for any proposed action which will have such an impact.

*Id.* at 6. Furthermore, in its official response to MDOT's Draft FEIS, NPS wrote:

> [W]e have some concerns about the adequacy of the analysis provided in the environmental impact statement (EIS) and are concerned with your responses to the DOI letter of June 10, 1990, in regard to your interpretation of the Wild and Scenic Rivers Act.

Letter from William W. Schenk to Charles E. Foslien 1 (Nov. 17, 1994). The letter goes on to reiterate the NPS' position that the Lower St. Croix is protected under "section 7 of the WSRA." *Id.* at 2.

The NPS also repeatedly raised the issue as a member of the Lower St. Croix Management Commission ("LSCMC"), a commission made up of representatives from the State of Wisconsin, the State of Minnesota, the Minnesota–Wisconsin Boundary Area Commission, and the NPS that manages the southernmost 25 miles of the Lower St. Croix. *See* Letter from James M. Harrison, Chairman, LSCMC, to Michael R. Louis, Project Manager, MDOT (Dec. 27, 1989) ("I am still not convinced that roads and bridges which require issuance of a federal permit for work in the waters of the United States for their construction are totally and summarily exempt from the provisions of Section 7(a) of the WSRA."); *see also* LSCMC Official Comment Letter on MDOT's Draft FEIS (Nov. 10, 1994).

Although MDOT continually maintained throughout the review process that it did not agree with the NPS' interpretation of the WSRA, there can be no doubt that the NPS consistently asserted that Section 7 would apply to the Proposed Bridge. Therefore, the NPS' application of its interpretation of the term "water resources project" has not been so inconsistent either generally, or with regard to the Proposed Bridge, as to render the interpretation unreasonable. MDOT was informed as early as 1988 that Section 7 would most likely be applied to the Proposed Bridge and yet chose, at its own peril, to forge ahead with plans for the Project's construction without obtaining NPS approval.

■ Finally, the Secretary's failure to publish its interpretation of the term "water resources project" in the Federal Register does not render its construction of the term impermissible. Section 552 of the APA only prohibits a party from being adversely affected by an agency's interpretation of general applicability where the party does not have actual and timely notice of the interpretation. 5 U.S.C. § 552(a)(1) ("... *Except to the extent that a person has actual and timely notice of the terms thereof,* a person may not in any manner be required to resort to or be adversely affected by, a matter required to be published in the Federal register and not so published.") (emphasis added). As shown by the correspondence set forth above, the NPS repeatedly informed MDOT that the Secretary considered the Proposed Bridge a "water resources project" because the Pro-

ject would involve placing piers in the riverbed and would require MDOT to obtain a COE dredge and fill permit.[5]

## B. Section 7 Determination

The second issue raised by MDOT's motion is whether the NPS rationally concluded that the Proposed Bridge would have a direct and adverse effect on the values for which the Lower St. Croix was included in the WSRS. MDOT argues that the NPS erred for two reasons: 1) the Lower St. Croix was not included in the System because of any remarkable scenic values, and, therefore, the NPS improperly considered the scenic impacts of the Proposed Bridge when it conducted the Section 7 determination; and 2) the NPS' conclusion that the Project will have a direct and adverse impact on the scenic and recreational value of the Lower St. Croix is arbitrary and capricious.

■ The NPS determination may only be set aside "upon a showing that the action is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Mausolf v. Babbitt,* 125 F.3d 661, 667 (8th Cir.1997) (citing 5 U.S.C. § 706(2)(A)). The Court must defer to an agency's decisions in matters within its area of expertise and may not substitute its own judgment for that of the agency. *Id.; see also Bankruptcy Estate of United Shipping Co. v. General Mills, Inc.,* 34 F.3d 1383, 1390–91 (8th Cir. 1994). A decision of "less than ideal clarity will be upheld if the agency's path may rea-

sonably be discerned"; however, the Court may not go so far as to "supply a reasoned basis for the agency's action that the agency itself has not given." *Mausolf,* 125 F.3d at 667. In *Mausolf,* the Eighth Circuit reversed the district court and upheld a NPS decision to close certain areas of Voyageurs National Park to snowmobiling pursuant to NPS regulations governing park and wildlife management. *Id.* at 669. The court concluded that although the evidence in the administrative record was not overwhelming, it was "sufficient to provide a rational foundation on which the NPS could base its closure order." *Id.*

As noted above, Section 7 of the WSRA directs the Secretary to determine whether a proposed water resources project will "have a direct and adverse effect on the values for which such river was established." 16 U.S.C. § 1278(a). A river may be established under the Act if it possesses any number of the following values: scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values. 16 U.S.C. § 1271. Once a river is chosen to be included in the System, the river and its adjacent land area are classified and administered as either a "wild," "scenic," or "recreational" river area. 16 U.S.C. § 1273(b). The three classifications are based upon the relative amount of development that has taken place in a given river area prior to its inclusion in the WSRS.[6] The upper 10.3 miles of the Lower St. Croix are classified as "scenic," while the lower 42

5. MDOT also argues that the piers of the Proposed Bridge would have an insignificant effect on the surface elevation of the Lower St. Croix, and, therefore, would not affect the free-flow of the river. There are a number of problems with this argument, the first of which is that each of the eight piers will occupy a significant square footage of the riverbed. In the areas where those piers are placed there will be a complete elimination of surface water and no water flow after the Project is completed. Second, the construction of the Proposed Bridge will inevitably affect the elevation of the river as fill will be required to create barge docks and dredging required to deepen the area sufficiently for barge access. Finally, the Act's definition of "free-flowing" is not limited to elevation concerns. The term is explicitly defined as "existing or flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway." 16 U.S.C.

§ 1286(b). Of the examples given in the statute, only impoundment inherently implies an change in water elevation.

6. "Wild river areas" are "those rivers ... that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted ." 16 U.S.C. § 1273(b)(1). "Scenic river areas" are "those rivers ... that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads." 16 U.S.C. § 1273(b)(2). "Recreational river areas" are "those rivers ... that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past." 16 U.S.C. § 1273(b)(3).

miles are classified as "recreational." A.R. at 756–57.

■ MDOT argues that because the section of the Lower St. Croix where the Proposed Bridge would be built is classified as a "recreational river area," the NPS erred in evaluating whether the Project would have an adverse impact on the scenic values of the river. MDOT's argument, however, confuses the values for which a river is established under the WSRA with the river's classification under the Act. The two are distinctly separate concepts. The former is based on a river's inherent attributes and the latter is based on a river's development at the time of inclusion. For example, just because a river is classified as a "scenic river area" does not mean that the river was included in the System solely for its remarkable scenic value. It may also have been included for its historic, recreational, or fish and wildlife value. Similarly, a river classified as "recreational" because of the amount of development on its shores, may have been included in the System for its scenic, historic, cultural, or fish and wildlife values. The fact that there is not a river area classification paralleling each of the values for which a river may be included in the System (e.g., a "historic river area" classification or a "fish and wildlife river area" classification) compels such an interpretation of the Act.

■ The NPS' determination that the Lower St. Croix was established under the WSRA for its scenic, as well as its recreational value is a supportable one. In arriving at its conclusion that the Lower St. Croix was included for its scenic value, the NPS relies on two documents: a 1973 Scenic River Study of the Lower St. Croix prepared pursuant to the WSRA ("Lower St. Croix Study"); and 2) a 1976 Lower St. Croix Master Plan prepared shortly after the final 25 miles of the river were included in the System. Both of these documents contain sufficient evidence to conclude that the Lower St. Croix was established for its scenic value. The WSRA calls for a study to be conducted on all rivers prior to their inclusion in the System to "show among other

things . . . the characteristics which do or do not make the area a worthy addition to the system," 16 U.S.C. § 1275. The Lower St. Croix Study found that the "[L]ower St. Croix River and its immediate environment possess outstandingly remarkable scenic and aesthetic, recreational, and geologic value." A.R. at 183. The Study points out that the Lower St. Croix exhibits a "highly scenic course, complemented by an island and slough river environment in the upper reaches and a lake-like river environment in the lower reaches." A.R. at 183. Similarly, the Master Plan explains that "Congress has found that the Lower St. Croix River and its immediate environment possess outstanding scenic and esthetic, recreational, and geologic values." A.R. at 731.

■ Finally, MDOT argues . that the NPS' determination that the Proposed Bridge would have a direct and adverse effect on the scenic and recreational values of the Lower St. Croix is arbitrary and capricious. The Court does not agree. The NPS made detailed, well-reasoned findings on both issues. With regard to scenic values, the NPS separated the viewing area into three smaller areas for analysis—upstream, downstream, and in the area of the Project. A.R. at 100. Based upon its analysis of the impacts on viewers in all three areas, the NPS explained that the Proposed Bridge would change the scenic qualities of the Lower St. Croix more than any development since the river's designation. A.R. at 112. This conclusion is based upon a finding that the massive bridge "would be visible for approximately 3 miles upstream and downstream," and would have a more significant visual impact at greater distances than any other developments in the area. *Id.* at 112–13. Furthermore, the NPS determined that because the Proposed Bridge would cut across the river, it would have a fundamentally greater visual impact than any of the current shoreline development. Although by its nature any bridge would have to stretch from one bank to the other, that fact exacerbates the impacts of the massive Proposed Bridge on the visual scene from many different points along the river. *Id.* at 113.[7]

7. MDOT argues that because there is a significant amount of development along the Minnesota

■ Likewise, the NPS' determination that the Project would have an adverse effect on the recreational value of the river is a rational one. The NPS concludes that in addition to the negative impact on recreationists' enjoyment of the natural and historic scene, the Proposed Bridge would create noise intrusions and multiple instream obstructions that would further degrade the recreational experience. A.R. at 117. MDOT does not directly contest either of these conclusions. Instead, MDOT argues that the NPS should have given "project need" paramount importance in conducting its evaluation. Project need, however, is not defined by either the WSRA or the Act's guidelines as a controlling factor to be analyzed in the Section 7 determination. MDOT's argument, therefore, is patently flawed. As long as the Lower St. Croix is part of the WSRS, the States of Minnesota and Wisconsin must obtain approval for any proposed "water resources project" without respect to project need .[8]

## IV. CONCLUSION

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

MDOT's Motion For Partial Summary Judgment is **DENIED**.

---

shoreline at the point where the Proposed Bridge will be constructed, the visual impacts of the Project will be relatively minor. As the NPS notes, however, "the Act and the management guidelines establish a nondegradation and enhancement policy for all rivers included in the System.... Placing the proposed bridge in an area which has existing visual intrusions, which in time may be eliminated, compounds negative visual impacts of the bridge." A.R. at 113. While this may not be the only way to view the situation, it is certainly a reasonable judgment squarely within the NPS' area of expertise.

8. MDOT claims that the NPS has given project need paramount importance in the past when proposing bridge projects over rivers that it manages. As support for its argument, MDOT cites *Coalition for Canyon Preservation, Inc. v. Hazen*, 788 F.Supp. 1522 (D.Mont.1990). The need for the bridge at issue in *Hazen*, however, was not a factor in the NPS Section 7 determination. The decision to approve the bridge under Section 7 was based on a finding that it would not have a direct and adverse impact on river values. *Id.* at 1529. The court specifically found that "it is clear from the record that the Park Service was cognizant of these values and took steps to protect the historic, scenic, aesthetic, archeologic, and scientific features of the river." *Id.*